**No. 25-1370**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

ARIZONA STATE LEGISLATURE, by and through the President of the Arizona State Senate, Warren Petersen, and the Speaker of the Arizona House of Representatives, Steve Montenegro; et al.,

*Plaintiffs-Appellants*,

v.

JOSEPH R. BIDEN, in his official capacity as President of the United States; et al.,

*Defendants-Appellees*,

STATE OF ARIZONA, by and through Attorney General Kris Mayes; et al.,

*Intervenor-Defendants-Appellees*.

_____

On Appeal from the United States District Court
for the District of Arizona
No. 3:24-cv-08026

**APPELLANTS' OPENING BRIEF**

Justin D. Smith
Michael E. Talent
JAMES OTIS LAW GROUP, LLC
530 Maryville Centre Drive, Suite 230
St. Louis, Missouri 63141
(816) 678-2103
Justin.Smith@james-otis.com

*Attorneys for Appellants*

## DISCLOSURE STATEMENT

A disclosure statement pursuant to Federal Rule of Appellate Procedure 26.1 is not required, as Appellants

- Arizona State Legislature, by and through President of the Arizona State Senate Warren Petersen and Speaker of the Arizona House of Representatives Steve Montenegro;

- Kimberly Yee, in her official capacity as Treasurer of the State of Arizona;

- County of Mohave;

- Town of Colorado City; and

- Town of Fredonia

are governmental parties.

Pursuant to guidance from the Clerk's Office, Appellants have identified the Defendants-Appellees in the caption as currently listed on the docket.

i

## **TABLE OF CONTENTS**

DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS ............................................................ ii

TABLE OF AUTHORITIES........................................................ iv

INTRODUCTION .................................................................... 1

JURISDICTIONAL STATEMENT ................................................. 2

ISSUE FOR REVIEW ............................................................... 2

CONSTITUTIONAL AND STATUTORY AUTHORITY ....................... 3

STATEMENT OF THE CASE...................................................... 3

   I.   Arizona's State Trust Land ............................................... 3

   II.     Federal land regulations in Arizona, and the breakdown of compromises that balanced land protection with land use. ......................................... 4

   III.    President Biden creates the Ancestral Footprints Monument, further restricting productive use of land around the Grand Canyon.................................. 6

   IV.    The Proclamation's negative effects on northern Arizona harm Appellants.......................................................................... 9

   V.   Proceedings in the district court. ...................................... 11

     A.   Appellants' injuries lead them to file suit against the unlawful Proclamation. ........................................................... 11

     B.   The district court grants the United States's motion to dismiss. ............. 14

SUMMARY OF ARGUMENT..................................................... 16

STANDARD OF REVIEW ........................................................ 18

ARGUMENT ....................................................................... 18

   I.   Appellants have standing to protect their economic interests. ..................... 19

     A.   The lost tax revenue and economic growth stemming from the Proclamation's mining ban constitutes an injury-in-fact. ................................. 19

     B.   Enjoining implementation of the Proclamation will redress the Local Government's injury........................................................... 28

   II.    The Arizona Legislature has standing to address its institutional harms. 30

   III.    Appellants have standing due to the diversion of their resources. .......... 38

   IV.    Appellants have standing because the Proclamation affects their rights as water and energy users. ...................................................... 44

CONCLUSION ...................................................................................49

CERTIFICATE OF RELATED CASES ...............................................50

CERTIFICATE OF COMPLIANCE ....................................................51

ADDENDUM

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Alaska Legislative Council v. Babbitt*,
    181 F.3d 1333 (D.C. Cir. 1999) ............................................................30

*Ariz. All. for Retired Ams. v. Mayes*,
    117 F.4th 1165 (9th Cir. 2024) ........................................ 16, 38-39, 43

*Ariz. All. for Retired Ams. v. Mayes*,
    130 F.4th 1177 (9th Cir. 2025) ............................................................38

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
    576 U.S. 787 (2015) ............................................................................30

*Belmont Abbey Coll. v. Sebelius*,
    878 F. Supp. 2d 25 (D.D.C. 2012) ......................................................26

*Biden v. Nebraska*,
    600 U.S. 477 (2023) ............................................................................37

*Brown v. Energizer Holdings, Inc.*,
    118 F.4th 1134 (9th Cir. 2024) ...........................................................18

*Bryant v. Yellen*,
    447 U.S. 352 (1980) ............................................................................27

*California Rest. Ass'n v. City of Berkeley*,
    89 F.4th 1094 (9th Cir. 2024) .............................................................23

*Campbell v. Flying V. Cattle Co.*,
    220 P. 417 (Ariz. 1923) ..................................................................34, 37

*Campbell v. Muleshoe Cattle Co.*,
    212 P. 381 (Ariz. 1923) ....................................................................4, 34

*Cappaert v. United States*,
    426 U.S. 128 (1976) ....................................................................... 44-45

*Chew v. Gates,*
    27 F.3d 1432 (9th Cir. 1994) ................................................................. 20

*City and Cnty. of San Francisco v. Trump,*
    897 F.3d 1225 (9th Cir. 2018) ............................................................... 28

*City of Oakland v. Lynch,*
    798 F.3d 1159 (9th Cir. 2015) ............................................................... 22

*City of Sausalito v. O'Neill,*
    386 F.3d 1186 (9th Cir. 2004) ............................................... 20, 43, 47

*Clements v. Airport Auth. of Washoe Cnty.,*
    69 F.3d 321 (9th Cir. 1995) ................................................................... 20

*Clinton v. City of New York,*
    524 U.S. 417 (1998) ................................................................................. 27

*Coleman v. Miller,*
    307 U.S. 433 (1939) ................................................................................. 32

*Czyzewski v. Jevic Holding Corp.,*
    580 U.S. 451 (2017) ................................................................................. 49

*Davis v. Agua Sierra Resources, LLC,*
    203 P.3d 506 (Ariz. 2009) ...................................................................... 46

*Douglas County v. Babbitt,*
    48 F.3d 1495 (9th Cir. 1995) ................................................................. 21

*Ervien v. United States,*
    251 U.S. 41 (1919) ............................................................................... 3, 33

*Fain Land & Cattle Co. v. Hassell,*
    790 P.2d 242 (Ariz. 1990) ...................................................................... 34

*Farkas v. Texas Instrument, Inc.,*
    375 F.2d 629 (5th Cir. 1967) ................................................................. 25

*FDA v. Alliance for Hippocratic Medicine,*
    602 U.S. 367 (2024) ................................................................ 16, 39, 43-44, 47

*Franchise Tax Bd. of Cal. v. Alcan Aluminium Ltd.,*
    493 U.S. 331 (1990) ................................................................................27

*Hall v. Smosh Dot Com, Inc.,*
    72 F.4th 983 (9th Cir. 2023) .................................................................22

*Havasu Heights Ranch & Dev. Corp. v. State Land Dep't of Ariz.,*
    764 P.2d 37 (Ariz. Ct. App. 1988) .......................................................37

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) ................................................................................43

*In re Gen. Adjudication of All Rights to Use Water in Gila River Sys. & Source
    (Gila III),*
    989 P.2d 739, 750 (Ariz. 1999) ............................................................48

*In re Gen. Adjudication of All Rights to Use Water in Gila River Sys. & Source
    (Gila IV),*
    9 P.3d 1069 (Ariz. 2000) ................................................................ 46-47

*In re Zappos.com, Inc.,*
    888 F.3d 1020 (9th Cir. 2018) ..............................................................21

*Inv. Co. Inst. v. Camp,*
    401 U.S. 617 (1971) ................................................................................27

*John v. United States,*
    720 F.3d 1214 (9th Cir. 2013) ..............................................................44

*Kadish v. Ariz. State Land Dep't,*
    747 P.2d 1183 (Ariz. 1987) ...................................................................34

*Kerr v. Hickenlooper,*
    824 F.3d 1207 (10th Cir. 2016) ............................................................31

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest,*
    624 F.3d 1083 (9th Cir. 2010) ..............................................................41

*Larson v. Valente*,
    456 U.S. 228 (1982)..............................................................29

*Lassen v. Arizona*,
    385 U.S. 458 (1967)..............................................................33

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)........................................... 23-24, 28

*Massachusetts v. EPA*,
    549 U.S. 497 (2007)..............................................................29

*Massachusetts Lobstermen's Association v. Raimondo*,
    141 S. Ct. 979 (2021)..............................................................7

*McConnell v. FEC*,
    540 U.S. 93 (2003)..............................................................24

*Mecinas v. Hobbs*,
    30 F.4th 890 (9th Cir. 2022)..............................................22

*Murphy Co. v. Biden*,
    144 S. Ct. 1111 (2024) ..........................................................26

*Nat'l Mining Ass'n v. Zinke*,
    877 F.3d 845 (9th Cir. 2017)..............................................20

*Newdow v. U.S. Congress*,
    313 F.3d 495 (9th Cir. 2002)..............................................31

*Orangeburg v. FERC*,
    862 F.3d 1071 (D.C. Cir. 2017) ....................................24, 26

*Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*,
    268 U.S. 510 (1925)..............................................................25

*Priorities USA v. Nessel*,
    978 F.3d 976 (6th Cir. 2020)..............................................31

*Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*,
    128 F.4th 1089 (9th Cir. 2025) ................................................................18

*Pub. Citizen, Inc. v. Trump*,
    361 F. Supp. 3d 60 (D.D.C. 2019) ........................................................26

*Pub. Lands for the People, Inc. v. U.S. Dep't of Agric.*,
    697 F.3d 1192 (9th Cir. 2012) ................................................................19

*Reg'l Rail Reorganization Act Cases*,
    419 U.S. 102 (1974) ................................................................................25

*Rodriguez v. City of San Jose*,
    930 F.3d 1123 (9th Cir. 2019) ................................................................20

*Sierra Club v. Trump*,
    977 F.3d 853 (9th Cir. 2020) ..................................................................21

*Silver v. Babbitt*,
    166 F.R.D. 418 (D. Ariz. 1994) .............................................................33

*Six v. IQ Data International, Inc.*,
    129 F.4th 630 (9th Cir. 2025) ................................................................36

*Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*,
    554 U.S. 269 (2008) ................................................................................36

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ..................................................................................36

*Tennessee ex rel. Tenn. Gen. Assembly v. U.S. Dep't of State*,
    931 F.3d 499 (6th Cir. 2019) ..................................................................31

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ..................................................................44

*Thomas More L. Ctr. v. Obama*,
    651 F.3d 529 (6th Cir. 2011) ..................................................................24

*Toma v. Fontes*,
    553 P.3d 881 (Ariz. Ct. App. 2024) ....................................................35

*Town of Chester v. Laroe Estates, Inc.*,
    581 U.S. 433 (2017)...........................................................................19

*Town of Chino Valley v. City of Prescott*,
    638 P.2d 1324 (Ariz. 1981)...........................................................46, 48

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021)...........................................................................18

*United States v. Ahtanum Irrigation Dist.*,
    236 F.2d 321 (9th Cir. 1956).............................................................46

*United States v. Lyndell N.*,
    124 F.3d 1170 (9th Cir. 1997)...........................................................25

*Va. House of Delegates v. Bethune-Hill*,
    587 U.S. 658 (2019)....................................................................31, 37

*Village of Bensenville v. FAA*,
    376 F.3d 1114 (D.C. Cir. 2004).........................................................26

*Warth v. Seldin*,
    422 U.S. 490 (1975)...........................................................................21

*Wash. Utils. & Transp. Comm'n v. FCC*,
    513 F.2d 1142 (9th Cir. 1975)...........................................................32

*Winters v. United States*,
    207 U.S. 564 (1908)...........................................................................46

*Yaw v. Del. River Basin Comm'n*,
    49 F.4th 302 (3d Cir. 2022)..........................................................31-32

*Yount v. Salazar*,
    2013 WL 93372 (D. Ariz. Jan. 8, 2013)......................................19-20

## Statutes, Rules & Regulations

9th Cir. R. 28-2.7 .................................................................................3

16 U.S.C. § 221 ....................................................................................5

28 U.S.C. § 1291 ..................................................................................2

28 U.S.C. § 1331 ..................................................................................2

43 U.S.C. § 1714(f) ............................................................................29

43 U.S.C. § 1714(j) ............................................................................29

54 U.S.C. § 320301(a) .........................................................................6

54 U.S.C. § 320301(b) .........................................................................6

ARIZ. CONST. art. V, § 9 .....................................................................42

ARIZ. CONST. art. X, § 1 ...............................................................4, 34

ARIZ. CONST. art. X, § 7 .......................................................................4

ARIZ. CONST. art. X, § 10 .....................................................................4

ARIZ. REV. STAT. § 17-261 ..................................................................40

ARIZ. REV. STAT. § 17-262 ..................................................................41

ARIZ. REV. STAT. § 17-271 ............................................................. 40-41

ARIZ. REV. STAT. § 17-297 ............................................................. 40-41

ARIZ. REV. STAT. § 17-298 ..................................................................40

ARIZ. REV. STAT. § 17-299 ............................................................. 40-41

ARIZ. REV. STAT. § 17-471 ............................................................. 40-41

ARIZ. REV. STAT. § 37-321(A).....................................................................35

ARIZ. REV. STAT. § 45-402(13) ..................................................................46

ARIZ. REV. STAT. § 45-453(1) ....................................................................46

Arizona-New Mexico Enabling Act, 36 Stat. 557 (1910), *as amended* .......... 3-4, 35

Establishment of the Baaj Nwaavjo I'tah Kukveni-Ancestral Footprints of the Grand Canyon National Monument, Proclamation No. 10606, 88 Fed. Reg. 55,331 (Aug. 15, 2023)...............................7-8, 11, 13, 25, 35, 40, 43, 45-46, 48

Exec. Order No. 14,154, 90 Fed. Reg. 8,353 (Jan. 29, 2025)....................................48

Exec. Order No. 14,241, 90 Fed. Reg. 13,673 (Mar. 25, 2025) ..............................48

FED. R. APP. P. 4(a)(1)(B)...........................................................................2

Public Land Order No. 77987, 77 Fed. Reg. 2,563 (Jan. 18, 2012) .......................25

## Other Authorities

12 *Williston on Contracts* § 35:34 (4th ed. May 2024 update)................................37

Ariz. Dep't of Water Res., *Groundwater Basins and Sub-Basins* (last visited May 14, 2025), https://www.azwater.gov/sites/default/files/2022-12/GWBasinV2.pdf .......13, 46

Univ. of Ariz., *Arizona Water Factsheet: Mohave County* 2 (Apr. 2023), https://wrrc.arizona.edu/sites/wrrc.arizona.edu/files/2024-01/Mohave_8-page_01_2024.pdf..............................................................................45

## **INTRODUCTION**

With the stroke of a pen, former President Joe Biden banned the productive use of almost 1 million acres in northern Arizona. This action permanently entombs one of the nation's largest and highest-grade uranium deposits. It also bars new roads and infrastructure from an area the size of Rhode Island.

Walling off a State-size area is not without consequences. Fewer jobs will be created due to the mining ban, and Arizona and local governments will not collect the billions of dollars in tax revenue that the jobs and mining activities would have generated. State Trust Land is effectively marooned because it is surrounded by federal land governed by the prohibitions on new roads and infrastructure. Staff resources and funding will be consumed by required collaboration and by the effects of the presidential decree, not to mention the impacts on water and energy users.

Five Arizona governmental entities—the Arizona State Legislature, the Arizona State Treasurer, and the local governments of Mohave County, Colorado City, and Fredonia—challenged this sweeping presidential action as exceeding a 1906 law passed to protect antiquities and violating two other federal statutes. The district court dismissed their claims for lack of standing.

That decision should be reversed. All Appellants have standing because they have each traced the presidential action to an injury-in-fact that is redressable by this case. The district court made erroneous findings to the contrary.

1

## JURISDICTIONAL STATEMENT

On February 12, 2024, Appellants filed a three-count complaint against federal officials in their official capacity and federal agencies, arguing that the Presidential Declaration creating the Ancestral Footprints Monument was *ultra vires* and inconsistent with federal law or, alternatively, that the Antiquities Act violated the Non-Delegation Doctrine and the Major Questions Doctrine.  2-ER-309–314. Because Appellants' claims arose under federal law and the Constitution, the district court had jurisdiction under 28 U.S.C. § 1331.  *See also* 2-ER-273.

On January 27, 2025, the district court granted the United States' Rule 12(b)(1) motion and dismissed Appellants' complaint and the complaint of Chris Heaton, whose case had been consolidated with this action.  1-ER-32–33.  That decision disposes of all claims and thus constitutes a final decision.  Appellate jurisdiction is proper under 28 U.S.C. § 1291.

Thirty days later, on February 26, 2025, Appellants filed their notice of appeal of the district court's dismissal.  3-ER-318–19.  Their notice of appeal is timely.  FED. R. APP. P. 4(a)(1)(B).

## ISSUE FOR REVIEW

Whether Appellants have standing to challenge the designation of nearly 1 million acres of land in Arizona as a national monument.

## **CONSTITUTIONAL AND STATUTORY AUTHORITY**

All relevant constitutional provisions and statutes are contained in the Addendum filed with this brief. *See* 9th Cir. R. 28-2.7.

## **STATEMENT OF THE CASE**

### I.     **Arizona's State Trust Land**

When Arizona was a territory, the United States owned all the land. That changed when Arizona ascended into Statehood. Under the Arizona-New Mexico Enabling Act (the "Enabling Act" or the "Act"), *see* §§ 19–35, 36 Stat. 557, 568–79 (1910), *as amended*, the United States granted to Arizona, in trust, roughly 10.8 million acres of land or 15 percent of the land in the State, scattered throughout the State. 2-ER-277–78.

The Enabling Act provides very limited instances when the United States could reacquire State Trust Land: when needed for irrigation or for hydro-electric power. 2-ER-278–79. It also establishes "a specific enumeration of the purposes for which the lands were granted." *Ervien v. United States*, 251 U.S. 41, 47 (1919). The Act requires that income from the trust goes to the provision of important State services—most notably, schools. *See* 2-ER-279, 297–98 (gathering authority noting the income derived from State Trust Land is "deposited into the permanent state school fund") (quotations omitted). As a result, changes in Trust income affect the State's budget generally. *See* 2-ER-301.

3

While the Enabling Act imposes a trust duty on the entire State, the Arizona State Legislature ("Legislature") plays a unique and integral role under the law, for it has the authority to implement the Act. *See* 2-ER-303–04. Section 28 of the Enabling Act provides that leasing State Trust Land is to be done "as the legislature … prescribe[s]." Likewise, exchanges of Trust Land for other land can be done only "under such regulations as the legislature … may prescribe." The Arizona Constitution enshrines those provisions, including the Legislature's integral position. *See* ARIZ. CONST. art. X, § 1. Indeed, Article 10, § 10, is "a mandate to the Legislature to enact proper laws for the sale of state lands, or the leasing thereof." *Campbell v. Muleshoe Cattle Co.*, 212 P. 381, 382 (Ariz. 1923). It also makes the State Treasurer "responsible for all investment activities" of the funds holding Trust income. 2-ER-298 (citing ARIZ. CONST. art. X, § 7(C)); *see also* ARIZ. CONST. art. X, § 7(A).

## II. Federal land regulations in Arizona, and the breakdown of compromises that balanced land protection with land use.

Notwithstanding the grant of State Trust Land, the federal government still owns 42 percent of Arizona's land. 2-ER-274. "Since the federal government controls more than four-tenths of the State, it is vitally important to Arizonans how the federal government allows its property to be used." 2-ER-274. Thus, there is a history of bipartisan, congressional action to establish reasonable land use laws that protect the natural beauty of the State while also permitting the productive use of the

4

land and its resources.  In 1919, Congress set aside over 1.2 million acres to create Grand Canyon National Park.  2-ER-274; *see also* 16 U.S.C. § 221.  For more than a century, "the Grand Canyon has been preserved for future generations—but preserved by congressional decree."  2-ER-274.  The land at issue in this case is not within Grand Canyon National Park.  2-ER-283.

Almost 70 years after it created the national park, Congress passed the Arizona Wilderness Act of 1984.  2-ER-279–82.  The Wilderness Act involved extensive bipartisanship and cooperation with numerous stakeholders.  2-ER-280.  A key subject of negotiations involved mining, including mining in the Arizona Strip, which consists of land in northern Arizona.  2-ER-281.

While there are other examples of actions taken directly by Congress or by the Executive Branch via statutory delegations to protect areas in northern Arizona, *see* 2-ER-275–76, Congress's initiative has died away as the compromise embodied in the Wilderness Act crumbled.  Twenty years after the Wilderness Act passed, the price of uranium surged—and uranium is abundant in northern Arizona.  2-ER-282.  Much uranium, around 326 million pounds, lay on federal land where mining was permissible.  2-ER-283.  "The increased interest in mining led" those opposed to the practice to work to ban it in areas where it had been allowed under the Wilderness Act.  2-ER-283–84.  They did not, however, succeed in Congress, as bills proposed to ban mining in northern Arizona failed.  2-ER-284–85.  So stymied, they turned to

the Executive Branch and, in 2009, the Secretary of the Interior imposed a two-year mining ban on roughly 993,000 acres in northern Arizona. 2-ER-284. In 2011, the Secretary barred mining in a little more than 1 million acres for six months. 2-ER-285. Finally, in 2012, he barred mining at a little more than 1 million acres for 20 years (the "2012 Withdrawal")—the longest he could under the relevant statutory authority. 2-ER-285.

### III. President Biden creates the Ancestral Footprints Monument, further restricting productive use of land around the Grand Canyon.

This case involves the latest executive action to close off federal land from productive uses, including mining—this time under the aegis of the Antiquities Act, 54 U.S.C. § 320301, *et seq.* The Act provides that "[t]he President may, in the President's discretion, declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments." 54 U.S.C. § 320301(a). After declaring an object—*i.e.*, a monument—to be a landmark, historic or prehistoric structure, or an object of historic or scientific interest, the President may then "reserve parcels of land as a part of the national monuments." 54 U.S.C. § 320301(b). Such parcels must be no larger than "the smallest area compatible with the proper care and management of the objects to be protected." *Id.*

6

When Congress passed the Antiquities Act in 1906, it meant what it said—
that it had designed the law "to protect only very small tracts of land around
archaeological sites." 2-ER-286 (quotations omitted); *see also* 2-ER-286–88. That
is, Congress's intent was to protect specific objects of interest. *See* 2-ER-286.
Indeed, Congress rejected attempts to broaden the law's scope, including by adding
to what the President could declare to be a monument. *See* 2-ER-288. The
Department of the Interior "shared the understanding that the Antiquities Act was
narrow and designed to preserve historic objects, not landscapes." 2-ER-288; *see* 2-
ER-288–289.

In recent times, Presidents have used the Antiquities Act to protect landscapes,
*see Massachusetts Lobstermen's Association v. Raimondo*, 141 S. Ct. 979, 980–81
(2021) (Roberts, C.J., respecting the denial of certiorari), including in northern
Arizona. On August 8, 2023, President Biden established the Baaj Nwaavjo I'tah
Kukveni-Ancestral Footprints of the Grand Canyon National Monument (the
"Ancestral Footprints Monument" or "Monument"). Proclamation 10606, 88 Fed.
Reg. 55,331 (Aug. 15, 2023) [hereinafter, the "Proclamation"]; 2-ER-289.
Composed of three separate areas of land, the Ancestral Footprints Monument is, in
total, roughly the size of Rhode Island and encompasses nearly 918,000 acres of land
in northern Arizona. 2-ER-290–91. The object of historic and scientific interest that
justifies the extensive designation is, per the Proclamation, "the 'entire landscapes

7

within the boundaries of'" the Monument. 2-ER-291 (quoting 88 Fed. Reg. at 55,338).

To be sure, there are other objects that the Proclamation designates under the Antiquities Act—though they, too, are far from what Congress had in mind. For instance, the Proclamation designates "[h]ydrologic features, especially groundwater dynamics," including potentially one aquifer within the Ancestral Footprints Monument, the groundwater itself, and objects related to water flow such as cliffs, caves, and other formations. 2-ER-292. The Proclamation also points to geological features, ecological transitions, fauna and plants, ecosystems and migration trails, and general study areas such as "'the relationship between historic climate change and human occupation.'" 2-ER-292 (citing the Proclamation and quoting 88 Fed. Reg. at 55,334). Indeed, the Proclamation is so fulsome, it includes "objects 'regardless of whether they are expressly identified as objects of historic or scientific interest,'" and objects that cannot be named, putatively to protect them from the public or the public from the objects. 2-ER-293 (quoting 88 Fed. Reg. at 55,338).

Besides designating as monuments items that Congress in no way intended to be so designated, the Proclamation serves purposes beyond protecting important relics. For one, it "was intended to address historical federal actions toward Native Americans and to preserve the land for their use." 2-ER-293–95. Consistent with

8

other unilateral executive actions in northern Arizona in the last 20 years, it also prevents "mining in the area." 2-ER-295–97.

## IV. The Proclamation's negative effects on northern Arizona harm Appellants.

In creating the Ancestral Footprints Monument, President Biden imposed restrictions on land use within the Monument that create deleterious regional and statewide effects. To start, the Proclamation negatively affects State Trust Land. The Proclamation forbids "entry into the Ancestral Footprints Monument," and has "a strict prohibition on motor vehicle use unless on an existing road or trail and air travel over the withdrawn lands." 2-ER-298. Further restrictions are also likely. *See* 2-ER-298.

But "[p]arcels of State Trust Land are surrounded by the Ancestral Footprints Monument." 2-ER-298. The Proclamation thus landlocks State Trust Land. The result is a *de facto* prohibition on the development of State Trust Land, with a corresponding reduction in value and loss of income from that land. 2-ER-298. It will also increase maintenance costs. 2-ER-298. In sum, "[t]he Ancestral Footprints Monument will restrict and prohibit uses on State Trust Land by making State Trust Land inaccessible, impacting water rights, prohibiting new mining claims, prohibiting new grazing leases, limiting new construction of infrastructure and other property improvements, and affecting other uses of State Trust Land that had previously been allowed." 2-ER-299.

As noted above, the Proclamation also bars mining on Monument land. *See also* 2-ER-299. Indeed, because the Monument "closely tracks" with the land declared off-limits to mining in the 2012 Withdrawal, *see* 2-ER-290, the Proclamation essentially makes permanent that ban, 2-ER-299. But "[m]ining generates fees and tax revenue for the State of Arizona and Mohave County." 2-ER-299. "Based on the location of the mine, additional taxes may be imposed on mining companies to support fire districts, flood control districts, K-12 schools and community colleges. Because taxes are often distributed equally among all parties to fund specific government functions, diminishing the tax contribution from the mining operations will simply shift the tax burden to other parties or require governments to cut necessary services." 2-ER-299.

This is especially true of uranium mining. 2-ER-300. "For example, a 2009 study indicated that uranium mining would provide a $29 billion benefit to local economies in Northern Arizona and Southern Utah, like Mohave County, over 42 years." 2-ER-300. "Uranium mining is also critical for ensuring power provision for the State." 2-ER-300. Indeed, in 2022, "29 percent of Arizona's total electricity net generation came from nuclear power." 2-ER-300. But "domestic nuclear energy production is dependent on foreign importation of uranium"—an inherently risky proposition as "[m]any uranium imports" are sourced from countries "with interests

adverse" to the United States or areas that are unstable.  2-ER-300; *see* 2-ER-282–83.

Indeed, the two restrictions coalesce.  Prohibitions on travel over Monument land, combined with additional restrictions on construction of new roads and highways, *see* 88 Fed. Reg. at 55,341, do not just landlock State Trust Land—they ensure that minerals under those lands are inaccessible.

Mining is not the only natural resource that the Proclamation puts beyond the reach of Appellants.  The Proclamation "creates ambiguity about water rights in the region" by imposing, or at least potentially creating, a massive federally reserved water right that conflicts with current groundwater usage in the Monument area.  2-ER-301.

## V.    Proceedings in the district court.

### A.    Appellants' injuries lead them to file suit against the unlawful Proclamation.

The broad-ranging effects of a roughly 1-million-acre federal monument designation translate into a plethora of specific, deleterious effects on numerous entities—including Appellants.

The Arizona State Legislature has suffered institutional harm to its right to implement the Enabling Act and to pass laws relating to mining leases, highway easements, improvements, and the state budget.  2-ER-301–04, 312–14.  Those harms all stem from the Ancestral Footprints Monument's landlocking of State Trust

Land, which strikes at the Legislature's traditional authority to regulate land and natural resource utilization in the State, *see* 2-ER-302 (discussing water rights), and its unique role in implementing and regulating State Trust Lands under the Enabling Act and the Arizona Constitution, *see* 2-ER-303–04. *See also* 2-ER-313. Furthermore, the Legislature will have to divert resources away from other core priorities to address the effects of the Proclamation on the State of Arizona, such as dealing with the budgetary effects from reduced Trust income and from the increased costs of maintenance of State Trust Land or handling the effect that the Proclamation will have on the State's energy supply and water rights. *See* 2-ER-301–03. The Legislature also suffers harm from the Proclamation's permanent ban on mining, as that ban will have negative effects on Arizona's ability to produce nuclear power, thus harming the Legislature as a consumer of energy. 2-ER-302.

Treasurer Yee suffers similar harms. She has a specific role in accounting for costs and revenue from State Trust Land, as well as a fiduciary duty common to all Arizona officials. *See* 2-ER-305–06. She also will have to divert resources to address the Proclamation's effect on the State and her duties. 2-ER-305.

Mohave County, Colorado City, and Fredonia (collectively, the "Local Governments") suffer harm directly stemming from their geographic proximity to the Ancestral Footprints Monument. "The Proclamation affects more than 400,000 acres of land in Mohave County." 2-ER-306. Mining is a significant source of

economic productivity and, thus, tax revenue for the County. 2-ER-306–07. Besides the loss of that prosperity and tax revenue, the County will have to devote significant time and energy "to addressing the effects of the Proclamation and management of the Ancestral Footprints Monument." 2-ER-307. The County also will suffer harm as a consumer of energy, just like the Legislature and Treasurer Yee. 2-ER-307. Likewise for Colorado City and Fredonia. *See* 2-ER-308–09.

Furthermore, the Local Governments face harm from the Proclamation's cloud on water rights in the region. "Colorado City's water supply comes from the aquifer that runs beneath the Monument," and thus the Proclamation "raises concerns about" the viability of the City's water rights. 2-ER-308. More generally, the water sources for the Local Governments and the Ancestral Footprints Monument are interconnected. All are located in the Kanab Plateau groundwater basin. *See* Ariz. Dep't of Water Res., *Groundwater Basins and Sub-Basins* (last visited May 14, 2025), https://www.azwater.gov/sites/default/files/2022-12/GWBasinV2.pdf (providing a map of Arizona's groundwater basins and sub-basins). The northwestern area of the Ancestral Footprints Monument "begins at the western edge of the Kanab watershed . . . ." 88 Fed. Reg. at 55,332.

Those specific harms led Appellants to file, on February 12, 2024, a three-count complaint against numerous federal officials and agencies (collectively, the "United States"). Count One argues that the Proclamation is not lawful under the

13

Antiquities Act and, if it is, the Act is an unconstitutional delegation of legislative authority. 2-ER-309–12. Count Two claims that the Proclamation violates the Enabling Act. 2-ER-312–14. Count Three alleges that the Proclamation violates the Arizona Wilderness Act of 1984. 2-ER-314. Appellants sought declaratory and injunctive relief, with relief running against the federal officials and agencies charged with implementing the Proclamation. 2-ER-315 & n.27. On April 30, 2024, the district court granted a joint motion to consolidate this case with a similar action involving an individual plaintiff. 3-ER-332 (docket number 31).

On June 3, 2024, the United States moved to dismiss the consolidated cases for want of jurisdiction. 3-ER-334 (docket number 49). While briefing on that motion proceeded, the district court granted the motion of the State of Arizona, through its Attorney General, and of the Governor to intervene as party defendants (the "Executive Officials"). 3-ER-335 (docket number 72). The Executive Officials filed their own motion to dismiss for lack of jurisdiction. 3-ER-335 (docket number 73).

### B.    The district court grants the United States's motion to dismiss.

On January 27, 2025, the district court ruled on the pending motions to dismiss, granting the United States's motion and denying the Executive Officials' motion as moot. 1-ER-32.

As to the Legislature, the court held that the Legislature brought claims that "belong to the State," which, the court said, the Legislature "is not authorized to" do.  1-ER-9.  The court reasoned that the "alleged harms … arise from Ancestral Footprints Monument's impact on" State Trust Land.  1-ER-9.  That did not fit what the district court considered to be "a decidedly narrow range of circumstances" in which legislative standing exists.  1-ER-10.  Rather, the court concluded, harm to State Trust Lands is "an abstract loss of sovereign authority" over those lands as opposed to a "direct, particularized harm[] to the Legislature … ."  1-ER-11.  In this respect, the district court noted that the Legislature had delegated authority over State Trust Land to the State Land Department "more than a century ago," and the court claimed that the Legislature could not exercise it now without violating the Arizona Constitution's separation-of-powers provision.  1-ER-11–15.  The district court also held that the Treasurer likewise lacked authority to sue for harms to State Trust Land.  1-ER-21.

As for the Local Governments, the district court concluded that their mining-related "injuries are not imminent or certainly impending," that Mohave County relies "on a prior decision in this district … that does not bear on the current litigation," that the Local Governments failed to provide "any meaningful distinction between the 2012 Withdrawal and the Proclamation that would constitute an imminent injury," and that the Local Governments failed to show redressability

15

because the 2012 Withdrawal barred mining in the same area and could be renewed after it expired in 2032. 1-ER-22; *see* 1-ER-22–26.

The district court addressed, in a lump, Appellants' argument that standing existed based on the diversion of their resources. After questioning whether only nonprofit organizations could raise such a theory, 1-ER-16–17, the district court held, in reliance on *Arizona Alliance for Retired Americans v. Mayes*, 117 F.4th 1165 (9th Cir. 2024), that *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), "disclaimed" this theory of standing and that it "is no longer good law," 1-ER-17.

The district court also held that the complaint failed to identify a "conflict between … existing water rights and the Proclamation's impacts … ." 1-ER-19. And it concluded that Appellants could not establish standing as energy consumers because their arguments were "exceedingly speculative … ." 1-ER-26–27.

Appellants timely appealed the district court's decision on February 26, 2025. 3-ER-318–19.

## SUMMARY OF ARGUMENT

The district court dismissed this case in response to a Rule 12(b)(1) motion. The court erred by concluding that Appellants did not sufficiently allege standing.

I. Appellants have standing to protect their economic interests. Appellants alleged that the mining ban will cost the state and local governments billions of dollars in lost tax revenue—advancing a standing theory that the District

of Arizona already accepted under almost identical facts in a different case. The district court erred by applying the incorrect pleading standards for the motion to dismiss stage, concluding that the alleged harms were not "imminent" or "certainly impending," and improperly discarding some allegations as too speculative.

II.    The Arizona State Legislature has standing to address its institutional harms. Federal law and the Arizona Constitution impose a mandate on the Legislature to enact laws relating to the disposition of State Trust Land, and the Supreme Court and several Circuits have recognized that a state legislature has standing when stripped of its prerogative to act. The district court erred by improperly narrowing the definition of an institutional injury and concluding that the Legislature sought to assert claims possessed by others.

III.    Appellants have standing due to the diversion of their resources. The Proclamation requires the United States to collaborate with the State of Arizona, which will require the Legislature and the Treasurer to divert resources. All Appellants will have to divert resources to address the effects of the Proclamation, and this diversion will interfere with their ability to manage core functions. The district court erred by relying on a since-vacated panel decision and finding that resources would not be diverted.

IV.    Appellants have standing because the Proclamation affects their rights as water and energy users. The Proclamation creates an implied federally reserved

17

water right, and it forces Appellants to rely on nuclear power sourced from unfriendly countries or unstable regions. The district court erred in rejecting these claims.

All Appellants have sufficiently alleged standing, and only one must have standing to proceed. This Court should reverse.

## STANDARD OF REVIEW

Review of a district court's dismissal under Rule 12(b)(1) is *de novo*. *See, e.g.*, *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*, 128 F.4th 1089, 1105 (9th Cir. 2025) (quotations omitted).

## ARGUMENT

Appellants have sufficiently alleged standing by pleading injuries of economic harm, institutional injury, and diversion of resources. Accordingly, this Court should reverse the district court's dismissal.

"To satisfy Article III's case or controversy requirement, a plaintiff must establish that she has standing to invoke the jurisdiction of the federal courts." *Brown v. Energizer Holdings, Inc.*, 118 F.4th 1134, 1142 (9th Cir. 2024). And that requires the plaintiff to show "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Because "standing is not

18

dispensed in gross, … [a]t least one plaintiff must have standing to seek each form of relief requested in the complaint." *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) (quotations omitted). If there is "at least one party with standing" to press a claim for a type of relief, "the controversy before the court is justiciable." *Pub. Lands for the People, Inc. v. U.S. Dep't of Agric.*, 697 F.3d 1192, 1197 (9th Cir. 2012).

## I. Appellants have standing to protect their economic interests.

### A. The lost tax revenue and economic growth stemming from the Proclamation's mining ban constitutes an injury-in-fact.

Appellants have standing because the Proclamation threatens their economic interests. The Local Governments, for example, allege that the Proclamation will reduce the tax revenue that they collect due to reduced mining activities and reduced economic development. *See* 2-ER-306, 308–09. Similarly, the Legislature and the Treasurer allege that they will receive less revenue in the state budget and state funds from State Trust Lands and mining. *See* 2-ER-301, 305. Mohave County also alleges that the reduced revenue will impose costs on it relating to its poverty services and measures to address budget shortfalls. *See* 2-ER-306–07.

These claims establish injury-in-fact—as another judge in the District of Arizona held in *Yount v. Salazar*, 2013 WL 93372 (D. Ariz. Jan. 8, 2013). *Yount* involved a multi-party challenge to the 2012 Withdrawal. *See id.* at *3. One plaintiff, the Arizona Utah Local Economic Coalition, "filed suit on behalf of named

member Mohave County." *Id.* at *10. Standing turned on the economic harm that the 2012 Withdrawal inflicted on Mohave County. *See id.*

Significantly for this case, the *Yount* court concluded that the 2012 Withdrawal would reduce mining activity in the area, which would then reduce the "projected state revenues that flow to Mohave County ... ." *Id.* at *12. "[T]hat loss ... will impair the county's ability to carry out county functions." *Id.* Thus, "Mohave County's projected economic losses resulting in an alleged inability to carry out specific plan objectives are sufficient to show injury to its proprietary interests." *Id.* at *13.[1]

Like Mohave County in *Yount*, the Local Governments have standing to defend their proprietary interests. In this Circuit, local governments may sue to protect their "proprietary interests," which include their "powers of revenue collection and taxation." *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197-98 (9th Cir. 2004) (citations omitted). In addition, this Court has "found constitutionally sufficient injury to proprietary interests where 'land management practices of federal

---

[1] The Secretaries of Interior and Agriculture, Defendants in both *Yount* and this case, did not challenge on appeal the *Yount* court's decision that Mohave County had standing to pursue its proprietary interests affected by the federal government's withdrawal of County area from mining. *See Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845, 861 (9th Cir. 2017). Issue preclusion thus may be applied to "conserv[e] judicial resources," *Rodriguez v. City of San Jose*, 930 F.3d 1123, 1131 (9th Cir. 2019), and "avoid inconsistent results," *Clements v. Airport Auth. of Washoe Cnty.*, 69 F.3d 321, 330 (9th Cir. 1995); *see also Chew v. Gates*, 27 F.3d 1432, 1437 n.2 (9th Cir. 1994).

20

land could affect adjacent [city]-owned land.'"  *Id.* at 1198 (quoting *Douglas County v. Babbitt*, 48 F.3d 1495, 1501 (9th Cir. 1995)).  After all, "[i]t is logical for the [local government] to assert that its lands could be threatened by how the adjoining federal lands are managed." *Douglas County*, 48 F.3d at 1501.

The injury-in-fact requirement has been established here.  As was sufficient for standing in *Yount*, the Proclamation "will result in a loss of tax revenue" to Mohave County, Colorado City, and Fredonia "from reduced mining activities and reduced economic development resulting from the reduced mining activities."  2-ER-306, 308, 309.  In fact, Appellants provided Mohave County's declarations from the *Yount* litigation documenting the "significant revenues" that the County would receive "[o]ver the life of the mines."[2]  2-ER-58-59; *see also* 2-ER-62.  The loss of revenue also will affect Mohave County's ability to provide the current level of services at the current tax rate while increasing the poverty rate, and thus local reliance on Mohave County's welfare services.  2-ER-306–07.  "Economic loss and the loss of tax revenues can be sufficient to establish Article III injury in fact." *Sierra Club v. Trump*, 977 F.3d 853, 870 (9th Cir. 2020), *vacated in light of changed*

---

[2] Because the Appellees did not present any affidavits or attack the factual allegations, these declarations did not convert the motion from a facial challenge into a factual challenge or Rule 56 motion. *See, e.g.*, *Warth v. Seldin*, 422 U.S. 490, 527 (1975); *In re Zappos.com, Inc.*, 888 F.3d 1020, 1023 n.2 (9th Cir. 2018).

21

circumstances *sub nom.*, *Biden v. Sierra Club*, 142 S. Ct. 56 (2021); *see also City of Oakland v. Lynch*, 798 F.3d 1159, 1164 (9th Cir. 2015).

The district court made three reversible errors in its rejection of Appellants' arguments: (1) it applied the incorrect pleading standards at the motion to dismiss stage; (2) it erroneously concluded that Appellants did not allege harms that were "imminent" or "certainly impending"; and (3) it improperly discarded some allegations as too speculative.

First, the district court applied the incorrect pleading standards at the motion to dismiss stage. The court faulted Appellants for failing to provide "persuasive evidence" and "new allegations of reduced economic projections." 1-ER-24. In short, the district court held that the Local Governments failed to show economic injury because they did not provide an economic study or new general plan. But requiring "affidavits or other evidence" at the pleading stage "misstates the law." *Mecinas v. Hobbs*, 30 F.4th 890, 896 n.2 (9th Cir. 2022).

The court also improperly narrowed Appellants' allegations of harm. "When 'deciding standing at the pleading stage, and for purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.'" *Hall v. Smosh Dot Com, Inc.*, 72 F.4th 983, 987 (9th Cir. 2023) (citation omitted). "At this stage, 'general factual allegations of injury

resulting from the defendant's conduct may suffice, for on a motion to dismiss [courts] presume that general allegations embrace those specific facts that are necessary to support the claim.'" *California Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1100 (9th Cir. 2024) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

The district court did not apply these standards to Appellants' pleading. Appellants claim that the Proclamation "essentially prohibits further use and development of the land…for the mining of important natural resources," 2-ER-270, including a permanent mining ban that encompasses "mining and geothermal leasing," 2-ER-299. Appellants thus allege harm "from reduced mining activities" caused by the Proclamation and the effect on "mining interests" and "natural resource ownership." 2-ER-301, 306, 308–09. The district court therefore failed to construe "mining activities" in Appellants' favor by improperly limiting their allegations to uranium mining. *See* 1-ER-24. The court did not accept as true Appellants' allegations that the Proclamation would cause them harm through lost tax revenue and lost economic productivity. *See* 1-ER-24, 25. And the court did not presume that general allegations of economic harm embraced the facts necessary to support Appellants' claims. *See* 1-ER-24. Those are reversible errors.

Second, the district court erred by concluding that Appellants did not allege harms that were "imminent" or "certainly impending." 1-ER-21. In part, this error

23

stemmed from the court's application of the improper pleading standard that excluded claims of present harm relating to mineral leasing, geothermal leasing, and patents under the mining laws. *See* 1-ER-24, 25; *see supra*. It also resulted from a misinterpretation of an overturned Supreme Court decision. *See* 1-ER-22 (discussing *McConnell v. FEC*, 540 U.S. 93 (2003), *overruled by Citizens United v. FEC*, 558 U.S. 310 (2010)). Based on *McConnell*, the district court concluded that its standing analysis "necessitates some temporal inquiry." *Id.* The district court then concluded that harm alleged to occur in 2032 was "too remote" and "not imminent or certainly impending." 1-ER-22–23.

The district court misinterpreted and misapplied *McConnell*. Standing failed in *McConnell* because of the uncertainty of harm, not its temporal distance. *Thomas More L. Ctr. v. Obama*, 651 F.3d 529, 538 (6th Cir. 2011), *abrogated on other grounds by Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012). Since imminence is "a somewhat elastic concept," *Lujan*, 504 U.S. at 564 n.2, "[s]tanding depends on the probability of harm, not its temporal proximity," *Orangeburg v. FERC*, 862 F.3d 1071, 1078 (D.C. Cir. 2017) (citation omitted).

Appellants have pleaded imminent and certainly impending harm both now and in 2032, when the Withdrawal is no longer effective. The Proclamation is

currently in effect[3] and harming Appellants. The 2012 Withdrawal explicitly did not affect mineral or geothermal leasing. Public Land Order No. 77987, 77 Fed. Reg. 2,563, 2,563 (Jan. 18, 2012). The Proclamation, however, does; it withdraws the Ancestral Footprints Monument "from disposition under all laws relating to mineral and geothermal leasing." 88 Fed. Reg. at 55,339. Thus, the Proclamation already is harming the Local Governments by eliminating the possibility of tax revenue and other economic development relating to mineral leasing, geothermal leasing, and patents under the mining laws, all of which were unaffected by the 2012 Withdrawal. *See Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 536 (1925) ("The injury to appellees was present and very real, not a mere possibility in the remote future."). In addition, absent action by the government or the courts, the Proclamation will be the sole prohibition on mining activities in 2032. *See Reg'l Rail Reorganization Act Cases,* 419 U.S. 102, 143 (1974) ("Where the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect.")

---

[3] Like executive orders, the Proclamation is "accorded the force and effect given to a statute enacted by Congress," *Farkas v. Texas Instrument, Inc.*, 375 F.2d 629, 632 (5th Cir. 1967), and "'[i]n the absence of an express provision in the statute itself, an act takes effect on the date of its enactment,'" *United States v. Lyndell N.*, 124 F.3d 1170, 1172 (9th Cir. 1997) (citation omitted).

This is certainly impending harm. Shortly after *McConnell*, the D.C. Circuit found that municipalities had standing to challenge a fee that would not be collected for 13 years. *See Village of Bensenville v. FAA*, 376 F.3d 1114, 1119 (D.C. Cir. 2004). Just like here, the injury was not "too attenuated or distant" for standing because the federal government's order was final and would be implemented absent action by a court. *Id.* Other courts also have allowed challenges years in advance. *See, e.g.*, *Orangeburg*, 862 F.3d at 1078 (five years); *Pub. Citizen, Inc. v. Trump*, 361 F. Supp. 3d 60, 82 (D.D.C. 2019) (timeline of "five to seven years" not "too long to support standing"); *Belmont Abbey Coll. v. Sebelius*, 878 F. Supp. 2d 25, 36 (D.D.C. 2012) ("The Supreme Court has allowed plaintiffs to proceed when challenging laws that would not take effect for three and even six years (or thereabouts).") (citing cases). Allowing these challenges of certain harm is especially appropriate given the time that judicial review may take. *See, e.g.*, *Murphy Co. v. Biden*, 144 S. Ct. 1111 (2024) (denying certiorari more than seven years after complaint filed); *see also Orangeburg*, 862 F.3d at 1079 (history of six-year delay "in a time-sensitive matter has to be factored in to the analysis of the imminence of [Appellant's] injury").

Third, the district court dismissed allegations relating to uranium prices by deeming them too speculative to support an injury-in-fact. *See* 1-ER-22–23. This again erroneously disregarded the well-pleaded facts and the inferences that can be drawn from them. The complaint alleges that the Proclamation permanently bans

26

mining of a substantial percentage of America's uranium deposits—hundreds of millions of pounds of "some of the highest grade uranium ore in th[e] country"—at a time when American utilities are relying almost entirely on hostile powers like Russia to meet their uranium needs. 2-ER-282–283. Given these allegations combined with the consistently elevated uranium prices for the past 20 years, 2-ER-282, the proper inference to draw from the allegations is that uranium prices will remain high enough to justify continued interest in mining in the area.

The district court's analysis cannot be squared with precedent. Courts "routinely recognize[ ] probable economic injury resulting from government actions that alter competitive conditions … ." *Clinton v. City of New York*, 524 U.S. 417, 433 (1998) (alterations and quotations omitted); *see also Inv. Co. Inst. v. Camp*, 401 U.S. 617, 620 (1971). Similarly, actions that reduce "the return on" stock investments give rise to a justiciable case "by lowering the value of [the] stockholdings." *Franchise Tax Bd. of Cal. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336 (1990).

Thus, even if Appellants cannot "with certainty establish" what the uranium prices will be in a few years, standing still exists because it is likely that the prices will still be high and mining companies will "stand to reap significant gains." *Bryant v. Yellen*, 447 U.S. 352, 366-68 & n.17 (1980). In sum, the *possibility* that future events could make the claimed injury nonexistent does not undermine

27

standing. *See City and Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1236 (9th Cir. 2018) ("[T]he possibility of non-enforcement does not mean the Counties lack standing."). Imminence only requires that an injury not be "*too* speculative for Article III purposes," *Lujan*, 504 U.S. at 564 n.2 (emphasis added). Standing premised on future injury thus exists where, like here, the relevant actors are rational and the pertinent conditions are relatively consistent.

Appellants have alleged a non-speculative injury-in-fact that is traceable to the Proclamation. The district court erred in concluding otherwise.

### B. Enjoining implementation of the Proclamation will redress the Local Government's injury.

The district court concluded that mining-related harms would not "be redressed by a favorable decision in this case." 1-ER-25. That conclusion also rests on the 2012 Withdrawal, with the district court reasoning that the Secretary of the Interior may "choose to extend the withdrawal" for another 20 years. 1-ER-25–26. If he did, the district court noted, "then any relief granted by this Court would not redress" the Local Governments' injuries. 1-ER-26.

Whether the Secretary would do that, the district court acknowledged, is entirely speculative. *See* 1-ER-26 ("[I]t is uncertain that the Secretary would renew the withdrawal … ."). The district court provided no authority holding that speculation about the actions of an independent third party creates redressability issues. In all events, it is clear that if the Proclamation remains in effect, then

whether the Secretary does or does not renew the withdrawal does not matter; mining is still prohibited.  Only in the absence of the Proclamation is there a chance that mining will happen in 2032.  The Supreme Court has rejected the "draconic interpretation of the redressability requirement" that would require Appellants to show that "they are *certain*, ultimately," to obtain the outcome that they seek.  *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (emphasis original).  In a similar vein, the Court has held that reducing the "risk of catastrophic harm" establishes redressability.  *Massachusetts v. EPA*, 549 U.S. 497, 526 (2007).

It is not clear that the Secretary even could extend the withdrawal.  The Secretary is prohibited from modifying or revoking any withdrawal creating a national monument under the Antiquities Act.  43 U.S.C. § 1714(j).  To the extent an extension differed from the Proclamation, the Secretary would be modifying the Proclamation's withdrawal.  An identical extension would run into other problems, for an extension is possible "only if the Secretary determines that the purpose for which the withdrawal was first made requires the extension … ."  43 U.S.C. § 1714(f).  Even if an extension remains possible, the Proclamation's existence will make it difficult, if not impossible, to satisfy this provision.

The district court erred in concluding that Appellants failed to allege that their injury would be redressed by judicial relief.

29

## II.    The Arizona Legislature has standing to address its institutional harms.

The Arizona Legislature is suing as an institution,[4] and "an institutional plaintiff [has standing to assert] an institutional injury." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 802 (2015). Thus, the Legislature has standing if it alleges an institutional injury.

The district court committed reversible error (1) by improperly narrowing what constitutes an institutional injury and using that definition against the Legislature, and (2) by concluding that the Legislature was attempting to assert claims possessed by others. *See* 1-ER-7–15. Correcting these errors demonstrates that the Legislature has standing.

Defining an institutional injury to a legislature begins the analysis. The district court believed that legislative standing only exists when a legislative vote is threatened or nullified. *See* 1-ER-7–8. This is incorrect.[5] The Supreme Court held that the Arizona Legislature suffered an institutional injury when it was stripped of its "prerogative to initiate redistricting." *Ariz. State Legislature*, 576 U.S. at 800. This Circuit also has noted cases where the Senate had standing because the issues

---

[4] This suit was brought by the Legislature, and not by individual members or by an individual house. 2-ER-270.

[5] The district court also intimated that legislative standing arises only in the context of intragovernmental disputes. *See* 1-ER-8–9. This, too, is incorrect. The Supreme Court has not limited "its analysis" in this area "to interbranch disputes." *Alaska Legislative Council v. Babbitt*, 181 F.3d 1333, 1337 (D.C. Cir. 1999).

"implicated the authority of Congress within our scheme of government, and the scope and reach of its ability to allocate power among the three branches." *Newdow v. U.S. Congress*, 313 F.3d 495, 498 (9th Cir. 2002).

Sister Circuits have applied a much broader interpretation than the district court. The Sixth Circuit, for example, has recognized that a State legislature suffers institutional harm from interference "with their federal … prerogatives" or "a disruption to [the] body's specific powers," including "a constitutionally assigned power." *Tennessee ex rel. Tenn. Gen. Assembly v. U.S. Dep't of State*, 931 F.3d 499, 511-12 (6th Cir. 2019) (citing *Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 670 n.6 (2019)). Thus, the Michigan legislature had standing to appeal when the effect of a district court ruling was to prohibit it from regulating "election[s] in a particular way," which disrupted "its powers to regulate elections … ." *Priorities USA v. Nessel*, 978 F.3d 976, 982 (6th Cir. 2020). Similarly, the Tenth Circuit defined an institutional injury as "some injury to the power of the legislature as a whole rather than harm to an individual legislator." *Kerr v. Hickenlooper*, 824 F.3d 1207, 1214 (10th Cir. 2016). And the Third Circuit provided examples of institutional injuries that "sound in a general loss of legislative power … ." *Yaw v. Del. River Basin Comm'n*, 49 F.4th 302, 314 (3d Cir. 2022). Those include another assuming "power reposed exclusively in the" legislative body or attempting "to exercise legislative authority exclusively vested in the" legislative body, nullification

of "present or future legislative action," and palpable and substantial diminishment of "legislative powers … ." *Id.* at 313–14 (quoting the complaint).

History provides additional support for a broader definition of institutional injury than the district court applied. The "impairment of an administrative agency's interest in the effective discharge of the obligations imposed upon the agency by law is the equivalent of the 'personal stake,' 'injury in fact,' or 'concrete injury' that would support standing … ." *Wash. Utils. & Transp. Comm'n v. FCC*, 513 F.2d 1142, 1149 (9th Cir. 1975), *overruled in different part by Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592 (1982). Indeed, such standing is closely related to legislative standing. The Supreme Court pointed to the "recognition of the legitimate interest public officials and administrative commissions, federal and state, to resist the endeavor to prevent the enforcement of statutes in relation to which they have official duties" in finding standing for the legislators in *Coleman v. Miller*, 307 U.S. 433, 441–42 (1939). The Proclamation's impairment of the Legislature's duty under the Enabling Act and Arizona Constitution to maximize the funds from the State Trust Land is thus a harm particularized to the Legislature. The Arizona Legislature has an obligation regarding State Trust Land, and thus a cognizable interest in effectively discharging it that is affected by the Proclamation.

Contrary to these cases, the district court required the Legislature to allege "a complete nullification of the Legislature's votes, … [or that] the Legislature's right to have the votes of a majority given effect has been overridden … ." 1-ER-10. The court then concluded that this "decidedly narrow range of circumstances … are not present here." *Id.* But under Supreme Court and Sister Circuit precedent, the Legislature has standing to assert institutional injuries to the Legislature's power, authority, and prerogative. The district court erred in its improperly narrow definition.

The district court further erred in concluding that the Legislature was attempting to assert claims held by the State, the State Land Department, and the State Attorney General. *See* 1-ER-12–15. The Legislature has a unique interest in State Trust Land as a matter of federal and State constitutional law. "Arizona holds state trust land in a fiduciary capacity." *Silver v. Babbitt*, 166 F.R.D. 418, 430 (D. Ariz. 1994). And the purpose of the trust "is not the land itself but the revenues it generates." *Id.* (citing *Lassen v. Arizona*, 385 U.S. 458, 463 (1967)). The Enabling Act gave to the Legislature the power of determining, within terms that Congress set, *see Ervien*, 251 U.S. at 47, how to achieve that purpose. Thus, section 28 of the Act provides for the leasing and exchange of land "in such manner as the legislature of the state of Arizona may prescribe." It also allows the Legislature to protect lessees' "rights to their improvements … ." That provision—and, indeed, the entire

33

Enabling Act—is echoed in the Arizona Constitution, *see* ARIZ. CONST. art. X, § 1, with additional restrictions on how the Legislature can dispose of or lease the land, *see Fain Land & Cattle Co. v. Hassell*, 790 P.2d 242, 244 (Ariz. 1990) (en banc).

Taken together, the Enabling Act and Arizona Constitution impose "a mandate" on the Legislature "to enact proper laws for the sale of state lands, or the leasing thereof." *Muleshoe Cattle Co.*, 212 P. at 382. That mandate also means that it is "exclusively the province of the state Legislature to provide a method for disposing of [State Trust Land] which would further the objects for which the various grants were made." *Campbell v. Flying V. Cattle Co.*, 220 P. 417, 418 (Ariz. 1923).

Federal law and the Arizona Constitution thus provide the Legislature with important prerogatives relating to State Trust Land. Like with redistricting in *Arizona State Legislature*, the Proclamation strips the Legislature of its prerogative to manage the disposition of State Trust Land. For instance, landlocking State Trust Land within the Ancestral Footprints Monument restricts the ability to sell or lease the land and reduces its value. That limits existing and future attempts "to provide a method for disposing of [Trust Land] which would further the objects for which the various grants were made." *Flying V. Cattle Co.*, 220 P. at 418.

Entry restrictions also nullify Legislative votes. For example, by reducing the Trust Land's value, the Proclamation effectively bars the Legislature from exercising its authority to set minimum lease rates or royalties for mineral rights. *See Kadish v.*

34

*Ariz. State Land Dep't*, 747 P.2d 1183, 1196 (Ariz. 1987) (discussing mineral leases). It also thwarts any protections that the Legislature provided existing lessees for "their improvements … in case of lease or sale …to other parties."  Enabling Act, § 28.  The Legislature created a statutory scheme establishing how a lessee can put improvements on State Trust Land.  Ariz. Rev. Stat. § 37-321(A).  But entry restrictions on Monument land that bar travel to interior Trust Land effectively nullifies that law; improvements, even if authorized under the Legislature's scheme, cannot be made on inaccessible land.  Other improvements, even if they could be made, will be infeasible if they involve construction over the Ancestral Footprints Monument—such as a pipeline.  *See* 88 Fed. Reg. at 55,341 (barring new improvements by only allowing maintenance or upgrades to existing improvements).  Those restrictions will have future effects as well, as any attempt that the Legislature makes to regulate, sell, dispose, or authorize improvements on State Trust Land surrounded by the Ancestral Footprints Monument will be for naught.  That is no different than stopping the Legislature "from legislating" as to those lands, which is "a direct injury to its constitutional authority."  *Toma v. Fontes*, 553 P.3d 881, 891 (Ariz. Ct. App. 2024), *review granted*.

In sum, imposing entry restrictions and extensively regulating federal land surrounding State Trust Land is a *de facto* exercise of regulatory authority over State Trust Land; it limits who may enter and on what terms; it limits or eliminates the

35

Legislature's authority to lease State Trust Land as a practical matter because it may bar future tenants from taking the property; and it limits or eliminates the Legislature's authority to protect lessees on those landlocked parcels. Such authority—to the extent it exists, *but cf.* 2-ER-312–14 (alleging that the Proclamation violates the Enabling Act)—belongs to the Legislature. Its usurpation is an institutional injury.

Indeed, the Legislature's authority over State Trust Land demonstrates that the Legislature's case is "of the sort traditionally amendable to, and resolved by, the judicial process." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998). The Legislature—as the constitutional branch of Arizona specifically charged with fulfilling the purposes of the trust that Congress created in the Enabling Act—is akin to a trustee over the State Trust Land. And "[t]rustees bring suits to benefit their trusts." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 287 (2008). Here, the benefit is the lifting of restrictions on Monument land that will impair the value and use of State Trust Land. It is thus a "close analogue" to traditional trustee suits, *Six v. IQ Data International, Inc.*, 129 F.4th 630, 634 (9th Cir. 2025), which suggests that this is "the type[] of case[] that Article III empowers federal courts to consider," *Sprint Communications Co.*, 554 U.S. at 274.

The district court erred by finding that those interests belonged to entities other than the Legislature. *See* 1-ER-11. For example, the district court noted that

36

the Legislature created the State Land Department to manage State Trust Land. 1-ER-12. But that confirms the Legislature's primacy over the leasing, disposition, and maintenance of State Trust Land, for it underscores that the State Land Department is simply a creature of the Legislature. The department has "no powers except those conferred upon" it by the Legislature. *Flying V Cattle Co.*, 220 P. at 420; *see also Havasu Heights Ranch & Dev. Corp. v. State Land Dep't of Ariz.*, 764 P.2d 37, 41 (Ariz. Ct. App. 1988).

The logic of the district court's analysis is that if the Legislature abolishes the Land Department, it has standing to sue. All that shows, however, is that the interest the district court believes only the Land Department could protect is an interest that belongs to the Legislature. It has standing to protect it. *See Biden v. Nebraska*, 600 U.S. 477, 493 (2023) ("Where a State has been harmed in carrying out its responsibilities, the fact that it chose to exercise its authority through a public corporation it created and controls does not bar the State from suing to remedy that harm itself."); 12 *Williston on Contracts* § 35:34 (4th ed. May 2024 update) (A principal "has all rights and duties under" a contract executed by his agent.).

Ultimately, the district court focused on the wrong question. Who is the real party in interest—which is what the district court considered—is different from whether the Arizona Legislature has suffered an institutional injury. Indeed, the Supreme Court discussed the two questions separately in *Bethune-Hill*, 587 U.S. at

37

663–71. Thus, whether and to what extent it matters that the Legislature has delegated authority for management of State Trust Lands to the State Land Department, whether only the Attorney General may sue in the name of the State, and the relevance of the State's separation-of-powers clause, 1-ER-12–15, are academic questions.

The Legislature has alleged institutional injuries. The district court erred in denying the Legislature standing.

## III.    Appellants have standing due to the diversion of their resources.

Appellants also alleged standing because the Proclamation will require them to divert significant resources from other important matters. The district court disagreed. *See* 1-ER-15–18. The court made two errors in reaching its conclusion: (1) it relied on a since-vacated panel decision for its view that a recent Supreme Court decision overruled this Circuit's precedent; and (2) it found resources would not be diverted.

First, the district court erred by relying on the panel decision in *Arizona Alliance for Retired Americans v. Mayes*, 117 F.4th 1165 (9th Cir. 2024). *See* 1-ER-17. The Court, however, voted to rehear *Arizona Alliance* en banc, vacating the panel's decision. *Ariz. All. for Retired Ams. v. Mayes*, 130 F.4th 1177 (9th Cir. 2025). At a minimum, the decision to rehear *Arizona Alliance* en banc shows that the district

court prematurely declared the end of this Court's precedents on diversionary standing.[6]

In any event, Appellants have standing even under the panel's decision in *Arizona Alliance*. The panel concluded that *Alliance for Hippocratic Medicine* allowed standing under a resource-diversion theory only where "an organization can show that a challenged governmental action directly injures the organization's pre-existing core activities and does so apart from the plaintiffs' response to that governmental action." 117 F.4th at 1170; *see also All. for Hippocratic Med.*, 602 U.S. at 395 ("Havens's actions directly affected and interfered with HOME's core business activities—not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer."). As demonstrated, *infra*, Appellants have satisfied that standard.

Second, the district court erred by finding that Appellants' resources would not be diverted. But Appellants sufficiently alleged that their interest in how the United States will manage the Ancestral Footprints Monument will necessitate devoting staff and staff time to "monitoring the effect the Proclamation will have on State Trust Land" and engaging with the United States on management of the new monument. 2-ER-303; *see also* 2-ER-305–08.

---

[6] Given the importance of the panel decision to the district court's decision, the Court should consider permitting supplemental briefing once the en banc opinion is issued.

39

The Proclamation's own terms underscore the point. The Proclamation provides that the Federal Government "shall seek to collaborate with the State of Arizona on wildlife management within the monument." 88 Fed. Reg. at 55,342. Such collaboration—mandated by the Proclamation itself—necessarily requires the Legislature and the Treasurer to divert resources from other vital public tasks. For example, in Arizona, wildlife management is granularly regulated by statute. *See* ARIZ. REV. STAT. §§ 17-101 to 17-621. Enabling the collaboration with the Federal Government mandated by the Proclamation may require new legislation, and that new legislation will necessarily divert staff time and attention that otherwise would be spent on pressing state priorities.

Similarly, the mechanics of funding the collaboration mandated by the Proclamation will divert resources from both the Legislature and the Treasurer. Several state funding streams would potentially finance the collaboration with the Federal Government prescribed by the Proclamation. These include the Wildlife Habitat Restoration and Enhancement Fund, ARIZ. REV. STAT. § 17-471; the Arizona Game and Fish Commission Heritage Fund, ARIZ. REV. STAT. §§ 17-297, 17-298; the Arizona Wildlife Conservation Fund, ARIZ. REV. STAT. § 17-299; the Wildlife Endowment Fund, ARIZ. REV. STAT. § 17-271; and the Game and Fish Fund, ARIZ. REV. STAT. § 17-261. Financing collaboration with the Federal Government with respect to the Monument likely will require additional management and activity with

40

respect to those accounts. By statute, the Treasurer must "invest and divest" money in each of these funds. ARIZ. REV. STAT. §§ 17-471(A); 17-297(B); 17-299(B); 17-271(C); 17-262(B). Thus, financing additional projects through funds such as these, as part of the collaboration mandated by the Proclamation, will necessarily require additional staff time and resources on the part of the Treasurer's Office. Those state resources necessarily will be drawn from the management of other state funds or the performance of the Treasurer's other important duties. That diversion of resources results directly from the Proclamation and undermines the performance of the Treasurer's official duties.

Between the plain text of the Proclamation and the interests that they have in the Monument, Appellants' decision to participate in any of the processes offered to them is not, practically speaking, voluntary. At a minimum, and absent judicial intervention, such action is necessary to ensure that the United States runs the Ancestral Footprints Monument in a way that minimizes harm to Appellants. Appellants are therefore put into the position of choosing "between suffering an injury"—losing out on providing input and perhaps shaping how the United States manages the Ancestral Footprints Monument—"and diverting resources to counteract the injury." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 n.4 (9th Cir. 2010). They have standing to avoid making that choice. *See id.*

41

The Proclamation also affects core activities of Appellants. As noted above, the diversionary effects of the Proclamation as to the Arizona Legislature affect the legislative calendar and may require the body to pass new laws. Affecting legislation plainly implicates core Legislative activity. In the same vein, the diversion of Treasurer Yee's resources implicates statutory directives to the Treasurer. Again, the injury is to a core activity of the Treasurer's office, whose duties are "prescribed by law." ARIZ. CONST. art. V, § 9. Finally, the Proclamation affects the Legislature's core role in implementing the Proclamation. *See supra* Argument § II.

It is no different for the Local Governments. "Like the Legislature," each "will have to divert resources to addressing the effects of the Proclamation and management of the Ancestral Footprints Monument," including engaging with the United States about management of the Ancestral Footprints Monument. 2-ER-307, 308, 309. Furthermore, the Local Governments allege that the Proclamation will require them to expend resources that would go to other important municipal programs. For example, Mohave County notes that the loss of revenue from the prohibition on mining—besides being its own cognizable injury—will "force Mohave County either to cut services or increase revenue, thus using up some of its indebtedness cap or to hold an election. In either situation, Mohave County must expend resources—either in the form of lost borrowing capacity or expending resources to hold an election, with the attendant risk the measure to increase debt

42

does not pass." 2-ER-307. A municipality's "powers of revenue collection and taxation" constitute one of its "proprietary interests" that are protectable in court. *City of Sausalito*, 386 F.3d at 1198. So here, again, there has been harm to a core activity.

Those injuries are "apart from [Appellants'] response to" the Proclamation. *Ariz. All. for Retired Ams.*, 117 F.4th at 1180. Loss of revenue, and the attendant diversion of resources to fill the financial gap, are clearly apart from any response the Local Governments may have to the Proclamation. They are a function of the laws affecting how Arizona municipalities can raise money, spend it, and incur debt. *See* 2-ER-307 (discussing Mohave County's "indebtedness cap" and the possibility of holding an election to raise funds). Likewise, Treasurer Yee faces resource diversions by virtue of her statutory directives and not by any response she is making to the Proclamation. The Legislature also must divert resources to pass statutes or funding required to collaborate with the federal government under the Proclamation. *See* 88 Fed. Reg. at 55,342 (requiring the federal government to "seek to collaborate with the State of Arizona"). These alleged diversions are consequences of the Proclamation and not Appellants' responses to it, and the result is a perceptible impairment of Appellants' ability to perform core functions. *See All. for Hippocratic Med.*, 602 U.S. at 395 (discussing *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)).

43

The same is true for Appellants' diversion of resources to address the management of the Monument through public comments and other discussions with the United States. *See* 2-ER-303, 305–09. Those expenditures focus on "addressing the effects of the Proclamation and management of the Ancestral Footprints Monument." 2-ER-303, 305–09. They are not Appellants' attempt to "spend [their] way into standing … by expending money to gather information and advocate against the defendant's action." *All. for Hippocratic Med.*, 602 U.S. at 394. Instead, diverting those resources reflects the reality that Appellants must respond to the significant effects that will arise by declaring almost 1 million acres in northern Arizona a federal monument. Appellants' "options for" addressing those effects are "limited" largely to what is alleged in the complaint, and that militates against concluding the allegations here are an attempt to manufacture standing via self-inflicted injuries. *Texas v. United States*, 809 F.3d 134, 158 (5th Cir. 2015).

## IV.    Appellants have standing because the Proclamation affects their rights as water and energy users.

Appellants have standing as users and consumers of water and energy. As to water, the Proclamation creates an implied federally reserved water right to unappropriated water "necessary to serve the purposes of [the] federal reservation[]." *John v. United States*, 720 F.3d 1214, 1225 (9th Cir. 2013); *see Cappaert v. United States*, 426 U.S. 128, 139–40 (1976) (finding a monument declaration resulted in a federally reserved water right).

44

That is so because reserving water is "necessary to accomplish the purposes for which [the Monument] was created." *Cappaert*, 426 U.S. at 139. The Proclamation designates groundwater dynamics, groundwater itself, and objects relating to water flow as objects subject to the Antiquities Act's protection. *See* 2-ER-292; *see also* 88 Fed. Reg. at 55,334–36 (providing specific designations). Moreover, the Proclamation designates "the entire landscapes within the boundaries" of the Monument. *Id.* at 55,338. Water—surface and ground—is necessary to preserve those landscapes. Indeed, by designating the landscapes as monuments, the Proclamation designates the water in the landscapes as protected monuments. Thus, "the protection" that the Proclamation provides to the Monument "is meaningful only if" it includes a right to surface and groundwater. *Cappaert*, 426 U.S. at 140.

That threatens the water supply of the Local Governments. *See* 2-ER-299, 313 (noting the Ancestral Footprints Monument will impact water rights). Groundwater supplies 61 percent of the water supply in Mohave County. Univ. of Ariz., *Arizona Water Factsheet: Mohave County* 2 (Apr. 2023), https://wrrc.arizona.edu/sites/wrrc.arizona.edu/files/2024-01/Mohave_8-page_01_2024.pdf. "Colorado City's water supply comes from the aquifer that runs beneath the Monument." 2-ER-308. And the Local Governments and the Ancestral Footprints Monument are all located in the Kanab Plateau groundwater basin.

45

*Compare* Ariz. Dep't of Water Res., *Groundwater Basins and Sub-Basins* (last visited May 14, 2025), https://www.azwater.gov/sites/default/files/2022-12/GWBasinV2.pdf (providing a map of Arizona's groundwater basins and sub-basins), *with* 88 Fed. Reg. at 55,334.  They are in "an area that" "enclose[s] a relatively hydrologically distinct body or related bodies of groundwater."  ARIZ. REV. STAT. § 45-402(13) (defining "groundwater basin").  Indeed, the Proclamation notes that "[t]he hydrologic features of these landscapes are … highly interconnected."  88 Fed. Reg. at 55,334.

The water usage of the Local Governments is thus almost certain to run up against the federal water reservation that the Proclamation creates.  In that conflict, the federal reserved water right wins.  *See, e.g.*, *Winters v. United States*, 207 U.S. 564, 577 (1908); *United States v. Ahtanum Irrigation Dist.*, 236 F.2d 321, 328 (9th Cir. 1956).  That is clearest as to groundwater pumping.  Appellants have a right to "[w]ithdraw and use groundwater for reasonable and beneficial use."  ARIZ. REV. STAT. § 45-453(1).  This is a usufructuary right.  *See Town of Chino Valley v. City of Prescott*, 638 P.2d 1324, 1328 (Ariz. 1981) (en banc).  Thus, "groundwater 'is not appropriable and may be pumped by the overlying landowner, subject to the doctrine of reasonable use,'" *Davis v. Agua Sierra Resources, LLC*, 203 P.3d 506, 508 (Ariz. 2009) (en banc) (quoting *In re General Adjudication of All Rights to Use Water in*

*Gila River System and Source (Gila IV)*, 9 P.3d 1069, 1073 (Ariz. 2000)), "and the federal reserved water rights doctrine," *Gila IV*, 9 P.3d at 1073.

So, before the Proclamation, the Local Governments could pump as much groundwater as they reasonably needed. After the Proclamation, their right to do so is restricted by the federal reserved right that the Proclamation creates. Thus, the Local Governments have standing. They are consumers of water and have an interest "in protecting [their] natural resources from harm" as well as in the effect of federal "land management practices [on] adjacent" municipally owned property—which will be affected by a lack of water. *City of Sausalito*, 386 F.3d at 1198 (quotations omitted). Indeed, it likely decreases its value, which underscores the Local Governments' standing. *See All. for Hippocratic Med.*, 602 U.S. at 385 ("When the government regulates one property, it may reduce the value of adjacent property.").

To be sure, the Proclamation does not attempt to quantify the amount of water necessary for the Ancestral Footprints Monument. But all that is necessary for an injury-in-fact is that the harm is "likely to occur soon." *Id.* at 381. Given the importance of groundwater to the Local Governments, the Proclamation's express designation of groundwater as a protected monument, and the Ancestral Footprints Monument's size, the conflict is likely to occur soon and will result in a restriction in the water the Local Governments can pump.

Nor is it relevant that the Proclamation does not affect "valid existing rights." 88 Fed. Reg. at 55,339. That is because "there is no right of ownership of groundwater in Arizona prior to its capture." *Town of Chino Valley*, 638 P.2d at 1328. *But see* 1-ER-19 (improperly relying on that provision). Thus, "federal reserved rights holders enjoy greater protection from groundwater pumping than do holders of state law rights." *In re Gen. Adjudication of All Rights to Use Water in Gila River Sys. & Source (Gila III)*, 989 P.2d 739, 750 (Ariz. 1999) (en banc).

Similarly, Appellants also have standing as consumers of energy. They allege that the Proclamation will disrupt the energy supply and impose higher prices on them. 2-ER-302, 306–09. Nearly 30 percent of Arizona's energy comes from nuclear power, and it is the second largest source of energy consumed in 2021. 2-ER-300. A steady supply of uranium is therefore necessary to ensure consistent, affordable energy in the State. But "domestic nuclear energy production is dependent on foreign importation of uranium," often from unfriendly countries or unstable regions. 2-ER-300.

This realization is spurring changes at the federal level, with President Trump recently signing executive orders to increase domestic uranium production. *See* Exec. Order No. 14,241, 90 Fed. Reg. 13,673 (Mar. 25, 2025); *see also* Exec. Order No. 14,154, 90 Fed. Reg. 8,353 (Jan. 29, 2025). But closing off more than 1 million acres in northern Arizona containing uranium ore, *see* 2-ER-295–96 (noting a

48

purpose of the Proclamation is to bar mining, including uranium mining, in the Monument), is antithetical to establishing a steady supply of domestic uranium. Thus, the Proclamation is a contributing factor to unnecessarily high energy costs. That gives Appellants standing. *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'").

## **CONCLUSION**

For those reasons, Appellants respectfully request that the Court reverse the district court's order dismissing their complaint.

Dated: May 14, 2025

Respectfully submitted,

JAMES OTIS LAW GROUP, LLC

*/s/ Justin D. Smith*
Justin D. Smith
Michael E. Talent
530 Maryville Centre Drive, Suite 230
St. Louis, Missouri 63141
(816) 678-2103
Justin.Smith@james-otis.com

*Attorneys for Appellants*

49

## CERTIFICATE OF RELATED CASES

### Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

**9th Cir. Case Number**: 25-1370

The undersigned attorney or self-represented party states the following:

[ **X** ]  I am unaware of any related cases currently pending in this court.

[  ]  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[  ]  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

*/s/* Justin D. Smith
May 14, 2025

50

## <u>CERTIFICATE OF COMPLIANCE</u>

9th Cir. Case Number: 25-1370

I am the attorney or self-represented party.
This brief contains **11,346** words, including **0** words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief (select only one):
[ X ] complies with the word limit of Cir. R. 32-1.
[   ] is a cross-appeal brief and complies with the word limit of Cir. R. 28.1-1.
[   ] is an amicus brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
[   ] is for a death penalty case and complies with the word limit of Cir. R. 32-4.
[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because (select only one):
[ ] it is a joint brief submitted by separately represented parties.
[   ] a party or parties are filing a single brief in response to multiple briefs.
[   ] a party or parties are filing a single brief in response to a longer joint brief.
[   ] complies with the length limit designated by court order dated _____.
[   ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


*/s/* Justin D. Smith
May 14, 2025