**No. 25-1370**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

ARIZONA STATE LEGISLATURE, by and through the President of the Arizona State Senate, Warren Petersen, and the Speaker of the Arizona House of Representatives, Steve Montenegro; et al.,

*Plaintiffs-Appellants*,

v.

JOSEPH R. BIDEN, in his official capacity as President of the United States; et al.,

*Defendants-Appellees*,

STATE OF ARIZONA, by and through Attorney General Kris Mayes; et al.,

*Intervenor-Defendants-Appellees*.

———————————————

On Appeal from the United States District Court
for the District of Arizona
No. 3:24-cv-08026

———————————————

### ADDENDUM TO APPELLANTS' OPENING BRIEF

———————————————

Justin D. Smith
Michael E. Talent
JAMES OTIS LAW GROUP, LLC
530 Maryville Centre Drive, Suite 230
St. Louis, Missouri 63141
(816) 678-2103
Justin.Smith@james-otis.com

*Attorneys for Appellants*

## <u>TABLE OF CONTENTS</u>

Ariz. Const. art. X, § 1 ............................................................1

Ariz. Const. art. X, § 7 ............................................................2

Ariz. Const. art. X, § 10 ..........................................................5

Arizona-New Mexico Enabling Act, § 28, 36 Stat. 557, 574-75 (1910), *as amended* ............................................................................6

Establishment of the Baaj Nwaavjo I'tah Kukveni-Ancestral Footprints of the Grand Canyon National Monument, Proclamation No. 10606, 88 Fed. Reg. 55,331 (Aug. 15, 2023) ......................................9

## <u>Arizona Constitution, Article X, § 1</u>

All lands expressly transferred and confirmed to the state by the provisions of the Enabling Act approved June 20, 1910, including all lands granted to the state and all lands heretofore granted to the Territory of Arizona, and all lands otherwise acquired by the state, shall be by the state accepted and held in trust to be disposed of in whole or in part, only in manner as in the said Enabling Act and in this Constitution provided, and for the several objects specified in the respective granting and confirmatory provisions. The natural products and money proceeds of any of said lands shall be subject to the same trusts as the lands producing the same.

## **Arizona Constitution, Article X, § 7**

A. A separate permanent fund shall be established for each of the several objects for which the said grants are made and confirmed by the enabling act to the state, and whenever any monies shall be in any manner derived from any of said lands, the same shall be deposited by the state treasurer in the permanent fund corresponding to the grant under which the particular land producing such monies was, by the enabling act, conveyed or confirmed.

B. No monies shall ever be taken from one permanent fund for deposit in any other, or for any object other than that for which the land producing the same was granted or confirmed.

C. All such monies shall be invested in safe interest-bearing securities and prudent equity securities consistent with the requirements of this section.

D. The legislature shall establish a board of investment to serve as trustees of the permanent funds. The board shall provide for the management of the assets of the funds consistent with the following conditions:

> 1. Not more than sixty percent of a fund at cost may be invested in equities at any time.
>
> 2. Equities that are eligible for purchase are restricted to stocks listed on any national stock exchange or eligible for trading through the United States national association of securities dealers automated quotation system, or successor institutions, except as may be prohibited by general criteria or by a restriction on investment in a specific security adopted pursuant to this subsection.
>
> 3. Not more than five percent of all of the funds combined at cost may be invested in equity securities issued by the same institution, agency or corporation, other than securities issued as direct obligations of and fully guaranteed by the United States government.

E. In making investments under this section the state treasurer and trustees shall exercise the judgment and care under the prevailing circumstances that an institutional investor of ordinary prudence, discretion and intelligence exercises in managing large investments entrusted to it, not in regard to speculation, but in regard

2

to the permanent disposition of monies, considering the probable safety of capital as well as the probable total rate of return over extended periods of time.

F. The earnings, interest, dividends and realized capital gains and losses from investment of a permanent fund, shall be credited to that fund.

G. The board of investment shall determine the amount of the annual distributions required by this section and allocate distributions pursuant to law. The annual distribution from the permanent funds:

>    1. For fiscal years 2012-2013 through 2014-2015, shall be two and one-half percent of the average monthly market values of the fund for the immediately preceding five calendar years.

>    2. For fiscal years 2015-2016 through 2024-2025, shall be six and nine-tenths percent of the average monthly market values of the fund for the immediately preceding five calendar years, except that in fiscal year 2015-2016, the distribution made from the permanent state school fund shall be $259,266,200.

>    3. Beginning with fiscal year 2025-2026, shall be two and one-half percent of the average monthly market values of the fund for the immediately preceding five calendar years.

H. For fiscal years 2015-2016 through 2024-2025, any increase in expendable earnings under section 37-521, subsection B, paragraph 4, Arizona Revised Statutes, that results from a distribution of more than two and one-half percent of the average monthly market values of the fund for the immediately preceding five calendar years pursuant to subsection G, paragraph 2 of this section shall be appropriated for basic state aid, including inflation adjustments required by section 15-901.01, Arizona Revised Statutes.

I. On or before February 1 of each year, if the average monthly market values of the fund for the immediately preceding five calendar years have decreased compared to the average monthly market values of the fund for the five-calendar-year period that immediately precedes the preceding five calendar years, the director of the office of strategic planning and budgeting, or its successor agency, and the director of the joint legislative budget committee, or its successor agency, shall jointly notify the governor, the president of the senate and the speaker of the house of representatives that a reduction to the distribution prescribed in subsection G, paragraph 2 of this

3

section is necessary to preserve the safety of the capital in the fund. On receipt of that notification, the legislature may enact legislation, with the approval of the governor, that reduces the distribution in subsection G, paragraph 2 of this section for the next fiscal year to at least two and one-half percent but less than six and nine-tenths percent of the average monthly market values of the fund for the immediately preceding five calendar years.

J. Any amount reduced pursuant to subsection I of this section is not required to be paid or distributed:

> 1. From any other source of public monies.

> 2. In any subsequent fiscal year.

K. If the legislature enacts legislation, with the approval of the governor, that reduces the distribution pursuant to subsection I of this section:

> 1. The legislature may reduce the base level for the next fiscal year by an amount commensurate with the reduction in the distribution from the permanent state school fund for the next fiscal year.

> 2. The amounts from the base level reduction are not required to be paid or distributed in any subsequent fiscal year.

> 3. The base level reduction is not part of the calculation of the base level for subsequent fiscal years.

L. This section preserves the authority vested in the legislature pursuant to this constitution.

M. This section and article XI, section 11 of this Constitution and the terms and appropriations of house bill 2001, fifty second legislature, first special session, fully satisfy the requirements of section 15-901.01, Arizona Revised Statutes.

## <u>Arizona Constitution, Article X, § 10</u>

The legislature shall provide by proper laws for the sale of all state lands or the lease of such lands, and shall further provide by said laws for the protection of the actual bona fide residents and lessees of said lands, whereby such residents and lessees of said lands shall be protected in their rights to their improvements (including water rights) in such manner that in case of lease to other parties the former lessee shall be paid by the succeeding lessee the value of such improvements and rights and actual bona fide residents and lessees shall have preference to a renewal of their leases at a reassessed rental to be fixed as provided by law.

**Arizona-New Mexico Enabling Act, § 28,**
**36 Stat. 557, 574-75 (1910),** *as amended*

That it is hereby declared that all lands hereby granted, including those which, having been heretofore granted to said Territory, are hereby expressly transferred and confirmed to the said state, shall be by the said state held in trust, to be disposed of in whole or in part only in manner as herein provided and for the several objects specified in the respective granting and confirmatory provisions, and that the natural products and money proceeds of any of said lands shall be subject to the same trusts as the lands producing the same. The trust funds (including all interest, dividends, other income, and appreciation in the market value of assets of the funds) shall be prudently invested on a total rate of return basis. Distributions from the trust funds shall be made as provided in article 10, Section 7 of the Constitution of the state of Arizona. As amended Dec. 7, 1999, H.R. 747, 113 Stat. 1682.

Disposition of any of said lands, or of any money or thing of value directly or indirectly derived therefrom, for any object other than for such particular lands, or the lands from which such money or thing of value shall have been derived, were granted or confirmed, or in any manner contrary to the provisions of this act, shall be deemed a breach of trust, except that amounts in the Miners' Hospital Endowment Fund may be used for the benefit of the Arizona Pioneers' Home. As amended Dec. 7, 1999, H.R. 747, 113 Stat. 1682.

No mortgage or other encumbrance of the said lands, or any part thereof, shall be valid in favor of any person or for any purpose or under any circumstances whatsoever. Said lands shall not be sold or leased, in whole or in part, except to the highest and best bidder at a public auction to be held at the county seat of the county wherein the lands to be affected, or the major portion thereof, shall lie, notice of which public auction shall first have been duly given by advertisement, which shall set forth the nature, time, and place of transaction to be had, with a full description of the lands to be offered, and be published once each week for not less than ten successive weeks in a newspaper of general circulation published regularly at the state capital, and in that newspaper of like circulation which shall then be regularly published nearest to the location of the lands so offered; nor shall any sale or contract for the sale of any timber or other natural product of such lands be made, save at the place, in the manner, and after the notice by publication provided for sales and leases of the lands themselves. Nothing herein contained shall prevent: (1) the leasing of any of the lands referred to in this section, in such manner as the legislature of the state of Arizona may prescribe, for grazing, agricultural, commercial, and domestic purposes, for a term of ten years or less; (2) the leasing of any of said lands, in such

6

manner as the legislature of the state of Arizona may prescribe, whether or not also leased for grazing and agricultural purposes, for mineral purposes, other than for the exploration, development, and production of oil, gas, and other hydrocarbon substances, for a term of twenty years or less; (3) the leasing of any said lands, whether or not also leased for other purposes, for the exploration, development, and production of oil, gas and other hydrocarbon substances on, in, or under lands for an initial term of twenty years or less and as long thereafter as oil, gas, or other hydrocarbon substance may be produced therefrom in paying quantities, the leases to be made in any manner, with or without advertisement, bidding, or appraisement, and under such terms and provisions as the legislature of the state of Arizona may prescribe, the terms and provisions to include a reservation of a royalty to said state of not less than 12 ½ per centum of production; or (4) the legislature of the state of Arizona from providing by proper laws of the protection of lessees of said lands, whereby such lessees shall be protected in their rights to their improvements (including water rights) in such manner that in case of lease or sale of said lands to other parties the former lessee shall be paid by the succeeding lessee or purchaser the value of such improvements and rights placed thereon by such lessee. As amended June 5, 1936, c. 517, 49 Stat. 1477; June 2, 1951, c. 120, 65 Stat. 51.

All lands, leaseholds, timber and other products of land, before being offered, shall be appraised at their true value, and no sale or other disposal thereof shall be made for a consideration less than the value so ascertained, nor upon credit unless accompanied by ample security, and the legal title shall not be deemed to have passed until the consideration shall have been paid. As amended June 5, 1936, c. 517, 49 Stat. 1477.

No lands shall be sold for less than their appraised value, and no lands which are or shall be susceptible of irrigation under any projects now or hereafter completed or adopted by the United States under legislation for the reclamation of lands, or under any other project for the reclamation of lands, shall be sold at less than twenty-five dollars per acre: *Provided*, that said state, at the request of the secretary of the Interior, shall from time to time relinquish such of its lands to the United States as at any time are needed for irrigation works in connection with any such government project. And other lands in lieu thereof are hereby granted to said state, to be selected from lands of the character named and in the manner prescribed in section twenty-four of this act. As amended June 5, 1936, c. 517, 49 Stat. 1477.

The state of Arizona is authorized to exchange any lands owned by it for other lands, public or private, under such regulations as the legislature thereof may prescribe: *Provided*, That such exchanges involving public lands may be made only as

7

authorized by Acts of Congress and regulations thereunder. Added June 5, 1936, c. 517, 49 Stat. 1477.

There is hereby reserved to the United States and excepted from the operation of any and all grants made or confirmed by this act to said proposed state all land actually or prospectively valuable for the development of water power or power for hydro-electric use or transmission and which shall be ascertained and designated by the secretary of the Interior within five years after the proclamation of the President declaring the admission of the state; and no land so reserved and excepted shall be subject to any disposition whatsoever of said state, and any conveyance or transfer of such land by said state or any officer thereof shall be absolutely null and void within the period above named; and in lieu of the land so reserved to the United States and excepted from the operation of any of said grants there be, and is hereby, granted to the proposed state an equal quantity of land to be selected from land of the character named and in the manner prescribed in section twenty-four of this act.

Every sale, lease, conveyance, or contract of or concerning any of the lands hereby granted or confirmed, or the use thereof or the natural products thereof, not made in substantial conformity with the provisions of this act shall be null and void, any provisions of the constitution or laws of the said state to the contrary notwithstanding. It shall be the duty of the Attorney General of the United States to prosecute, in the name of the United States and in its courts, such proceedings at law or in equity as may from time to time be necessary and appropriate to enforce the provisions hereof relative to the application and disposition of the said lands and the products thereof and the funds derived therefrom.

Nothing herein contained shall be taken as in limitation of the power of the state or of any citizen thereof to enforce the provisions of this act.

**Establishment of the Baaj Nwaavjo I'tah Kukveni-Ancestral Footprints
of the Grand Canyon National Monument,
Proclamation No. 10606, 88 Fed. Reg. 55,331 (Aug. 15, 2023)**

**\*55331 By the President of the United States of America**

**A Proclamation**

Since time immemorial, many Tribes of the Southwest have lived and prayed among the canyons and plateaus of a landscape unlike any other in the world. The region is described in numerous languages. Many of the Indigenous names for the area reflect the deep interconnection between the land and its Tribal Nations. For example, the Havasupai call it baaj nwaavjo, or "where Indigenous peoples roam." To the Hopi, it is i'tah kukveni, or "our ancestral footprints." In English, we call the canyon that lies at the center of this region "the Grand Canyon."

In addition to its profound historical, cultural, and religious significance, the Grand Canyon region is known around the world for containing some of the greatest natural wonders on the planet. The area supports remarkable geology and a diversity of wildlife and plants that flourish in its vast and well-connected ecosystem.

The Grand Canyon region has played a central role in America's conservation history. In 1893, 2 years after the establishment of the National Forest System, the area was designated as the Grand Canyon Forest Reserve. In 1908, 2 years after the Congress passed the Antiquities Act, President Theodore Roosevelt used his authority under the Act to protect some of the deepest canyons along the Colorado River as a national monument. In 1919, 3 years after the establishment of the National Park Service, the Congress created Grand Canyon National Park. Today, millions of people from around the world come to the Grand Canyon region each year to visit, learn in, and explore the national park and the plateaus and canyons that surround it. The conservation and stewardship of the broader Grand Canyon region have helped safeguard the integrity of vital natural resources important to the Nation's health and well-being, including clean drinking water that flows through the region's springs and streams and into the Colorado River, before eventually reaching the taps of millions of homes across the Southwest.

The history of the lands and resources in the Grand Canyon region also tells a painful story about the forced removal and dispossession of Tribal Nations and Indigenous peoples. The Federal Government used the establishment of Grand Canyon National Park to justify denying Indigenous peoples access to their homelands, preventing them from engaging in traditional cultural and religious practices within the

9

boundaries of the park. Despite these barriers, Tribal Nations and Indigenous peoples persevered and continued to conduct their long-standing practices on sacred homelands just outside the boundaries of the national park, among the vast landscapes of plateaus, canyons, and tributaries of the Colorado River.

The lands outside of the national park contain myriad sensitive and distinctive resources that contribute to the Grand Canyon region's renown. In many of these lands outside of the national park, however, the Federal Government permitted or encouraged intensive resource exploration and extraction to meet the needs of the nuclear age. For decades, the Tribal Nations and Indigenous peoples of the Grand Canyon region have worked to protect the health and wellness of their people and the lands, waters, **55332** and cultural resources of the region from the effects of this development, including by cleaning up the abandoned mines and related pollution that has been left behind.

Much of the health and vitality of the Grand Canyon region today is attributable to the tireless work of Tribal Nations and Indigenous peoples, the lands' first and steadfast stewards. In the tradition of their ancestors, who fought to defend the sovereignty of their nations and to regain access to places and sites essential to their cultural and traditional practices, Tribal Nations and Indigenous peoples have remained resolute in their commitment to protect the landscapes of the region, which are integral to their identity and indispensable to the health and well-being of millions of people living in the Southwest.

Efforts to address the legacy of dispossession and exclusion of Tribal Nations and Indigenous peoples in the Grand Canyon region and to conserve the region's cultural and natural resources beyond the boundaries of Grand Canyon National Park span several decades. In 1975, the Congress took a first step toward addressing these earlier injustices when it restored lands along the Grand Canyon's rim to the Havasupai Tribe and established cultural use lands as part of an expansion of Grand Canyon National Park. More recently, legislation has been introduced in multiple Congresses to permanently conserve the lands to the south, northeast, and northwest of Grand Canyon National Park for the benefit of Tribes, the public, and future generations. In addition, in 2012, the Secretary of the Interior withdrew many of these lands from the location of new mining claims for a 20-year period.

Conserving lands that stretch beyond Grand Canyon National Park through an abiding partnership between the United States and the region's Tribal Nations will ensure that current and future generations can learn from and experience the

10

compelling and abundant historic and scientific objects found there, and will also serve as an important next step in understanding and addressing past injustices.

The natural and cultural objects of the lands have historic and scientific value that is unique, rich, and well-documented. The sweeping plateaus to the south, northeast, and northwest of Grand Canyon National Park constitute three distinct areas, each of which is an integral part of the broader Grand Canyon ecosystem. The northwestern area, which is administered by both the Bureau of Land Management (BLM) within the Department of the Interior and the U.S. Forest Service (Forest Service) within the Department of Agriculture, begins at the western edge of the Kanab watershed and northern boundary of Grand Canyon National Park and stretches north to the Shinarump Cliffs and Moonshine Ridge. The northeastern area primarily includes parts of House Rock Valley, which are administered by the BLM and the Forest Service, and extends west from Marble Canyon along the Colorado River to the edge of the Kaibab Plateau. The southern area includes a portion of the Coconino Plateau to the south of Grand Canyon National Park that is managed by the Forest Service, and extends from the border of the Havasupai Indian Reservation in the west to the Navajo Nation in the east.

While the greater Grand Canyon region is indisputably a cultural resource in its entirety, the landscapes in these three discrete areas are themselves historically and scientifically significant. They give context to the individual geologic features and other resources found there, contain numerous archaeological sites, and provide havens for sensitive and endangered species—including the California condor, desert bighorn sheep, and endemic plant and animal species—all of which constitute objects of independent historic or scientific interest. The landscapes are also integrally connected to the Indigenous Knowledge amassed by the Tribal Nations and Indigenous peoples in the area over countless generations. Some of the objects in these areas are sacred to Tribal Nations; are sensitive, rare, or vulnerable to vandalism and theft; or are unsafe to visit. Therefore, revealing their specific names or locations could pose a danger to the objects or to the public.

**The President**
**\*55333** These areas lie within the homelands of numerous Tribal Nations—including the Havasupai Tribe, Hopi Tribe, Hualapai Tribe, Kaibab Band of Paiute Indians, Las Vegas Paiute Tribe, Moapa Band of Paiutes, Paiute Indian Tribe of Utah, Navajo Nation, San Juan Southern Paiute Tribe, Yavapai-Apache Nation, Pueblo of Zuni, and the Colorado River Indian Tribes—who describe the lands here as a cultural landscape to which their ancestors belong. The surrounding plateaus, canyons, and tributaries of the Colorado River are central and sacred components of

11

the origin and history of multiple Tribal Nations, weaving together overlapping spiritual, cultural, and territorial systems. Many Tribes note that their ancestors are buried here and refer to these areas as their eternal home, a place of healing, and a source of spiritual sustenance. Like their ancestors, Indigenous peoples continue to use these areas for religious ceremonies; hunting; and gathering of plants, medicines, and other materials, including some found nowhere else on Earth.

The areas to the south, northeast, and northwest of Grand Canyon National Park contain over 3,000 known cultural and historic sites, including 12 properties listed on the National Register of Historic Places, and likely a great many more in areas not yet surveyed. All three areas contain locations that are sacred or significant to the Apache, Havasupai, Hopi, Hualapai, Navajo, Southern Paiute, Yavapai, and Zuni Peoples, whose ancestors lived, hunted, farmed, and gathered here, some moving among camps in different places to take advantage of the best seasonal times and locations to hunt or harvest resources. More than 50 species of plants that grow in these areas, including catsclaw, willow, soapweed, and piꟷntilde»on, have been identified as important to Tribal Nations. Historic shared use by different Tribes of the plateaus in the three areas, including for farming, hunting, and resource gathering on the Coconino Plateau, helped build strong, intergenerational relationships among the Tribal Nations that call this region home.

For hundreds of years, Tribal Nations and Indigenous peoples used trails across portions of all three distinct landscapes to access sacred or important sites in surrounding areas such as the Grand Canyon, Mount Trumbull, and the Hopi salt mine. For example, routes throughout the southern area connect the Grand Canyon with the Paiute, Hopi, and Navajo homelands. Historically significant pathways in all three areas can still be seen on the landscape, and in many cases, they continue to be actively used.

In the northwestern area, within the larger Kanab Creek drainage and particularly along Kanab Creek, there is evidence of ancient villages and habitations, including cliff houses, storage sites, granaries, pictographs, and pottery. The Kanab Plateau contains dwelling sites, including one known to have been occupied nearly 1,000 years ago, evidencing agricultural use and hunting by early inhabitants. The Kaibab Band of Paiute farmed in the area, which served as an important trade and transportation route, resource procurement and hunting area, and refuge during Euro-American encroachment into traditional territories. The pictographs and petroglyphs found in the Kanab Creek drainage present a spectacular collection of rock art. One pictograph and petroglyph site in Kanab Creek Canyon has been used for over 2,000 years, including for Ghost Dance ceremonies in the 19th century. Also

in the northwest, the BLM manages the Moonshine Spring and its associated historic cultural sites as the Moonshine Ridge Area of Critical Environmental Concern. Nearby Antelope Spring, Shinarump Cliffs, and Yellowstone Spring house historically important cultural sites, and the northwestern portion of the area is a historically significant resource and hunting area for the Southern Paiute.

In House Rock Valley in the northeastern area, many remnants of homes, storage buildings, pottery, and tools illustrate the area's rich and extensive human history. The area has long been historically important to Tribal Nations for hunting and resource gathering, including to the Kaibab Band of Paiute for hunting deer and pronghorn and gathering pi̅ntilde»on nuts, and to the San Juan Paiute for seasonal seed collection.

**\*55334** In the southern area, visible for miles in all directions, rises Red Butte, a towering landmark that is eligible for inclusion on the National Register of Historic Places as a traditional cultural property. Called Wii'i Gdwiisa by the Havasupai and Tse'ii'ahi' by the Navajo, it is defined by an eroded rock and basalt cap from ancient lava and is sacred to the Havasupai, Hualapai, Navajo, Hopi, and Zuni Peoples. Red Butte and the surrounding area are central to Tribal creation stories, and dense concentration of flaked stone tools and pottery provide evidence of thousands of years of human habitation there. Additionally, more recent Navajo and Havasupai encampments in the area date to the early to middle 1900s. South of Red Butte, Gray Mountain, called Dzi̅lstrok»beeh by the Navajo, is mentioned in Navajo ceremonial songs, stories, and rituals, and has long served as a refuge for the Navajo people.

There are many other physical remnants of human habitation in the southern area, including lithic sites containing stone tools that may be more than 10,000 years old and more recent sites containing finely decorated pottery sherds that are between 800 and 1,100 years old. Across the southern area, there is evidence of tool production using local materials and the historic use of fire for land management. Rock paintings, cave shelters, shrines, pit houses, masonry structures, and sites for religious ceremonies can be found throughout.

The southern area also provides important opportunities for research about ancient occupation, including a long-term archaeological study area in the upper basin of the Coconino Plateau where research has been conducted for decades. This study area has led to research on the sourcing of materials for pottery, the conditions that influenced where people lived and congregated, the history and use of anthropogenic fire, methods for recording archaeological sites, methods for protecting cultural resources, and human modification of bedrock, among other topics. Additionally,

13

research has occurred in the area on the relationship between historic climate change and human occupation, including how climate changes affected construction techniques by the Indigenous peoples in the region, the viability of farming, the use of fire, and available resources.

A defining feature of the three areas is their unique sedimentary and tectonic history, which has resulted in high scientific interest and made the groundwater dynamics of the region among the best studied in the United States. Subsequent studies of the areas' hydrology may prove important to understanding the formation of the Grand Canyon and the dynamics of groundwater and aquifers in the arid Colorado Plateau. Groundwater moving through this complex and distinctive system eventually flows into the meandering and majestic Colorado River, across hundreds of miles of arid and desert lands. The areas' unique hydrology has supported Indigenous peoples and other forms of life since time immemorial and continues to play an essential role in providing drinking water and supporting agricultural production and other services for millions of people across the Southwest.

The three areas' extensive fractures and faults direct the flow of water, resulting in the formation of seeps and springs that serve as small oases in the otherwise hot, dry landscape, and support some of the most biodiverse habitats in the Colorado Plateau. The hydrologic features of these landscapes are unique and highly interconnected, with groundwater moving through the Redwall-Muav aquifer in the south and through fractures and linked cave passages. The Havasupai and Hualapai Tribes, as well as the town of Tusayan, Arizona, and other towns in the region, rely on the southern area's groundwater. Ultimately, the areas' groundwater flows to the surrounding tributaries, into the Colorado River, and through the Grand Canyon, serving as one of many features tying this landscape together. Much of the water in the areas to the northeast, northwest, and south of the Grand Canyon, from creeks to streams, only runs seasonally based on melting snowpack and monsoon rains.

**\*55335** The geology and hydrologic system of the Grand Canyon and these three landscapes are deeply intertwined. Located within the Colorado Plateau and adjacent to the Grand Canyon, the areas' remarkable geology is characterized by exposed sedimentary rock and high, sometimes deeply incised, plateaus. The Mississippian-aged Redwall Limestone, known for the stunning red cliffs of the Grand Canyon itself, is present throughout the three landscapes and is the most abundant component of the Redwall-Muav aquifer. This aquifer overlaps with the southern portion of the Grand Canyon landscape, underneath the Coconino Plateau. Dissolution of the Redwall and associated Muav limestones has resulted in the formation of hundreds of karst features such as caves, caverns, and channels.

14

In the northeastern area, the Glen Canyon Group—a geologic formation composed of Navajo Sandstone, the Kayenta Formation, and the Moenave Formation—represents a continuation of the strikingly beautiful and significant geology found at the adjacent Vermilion Cliffs National Monument. The Kaibab Formation, another geologic formation that is prevalent throughout all three areas, forms most of the rim rock of the Grand Canyon and is responsible for additional significant cave and karst formations in these three regions as well as in Wupahtki National Monument and Grand Canyon National Park itself.

The Toroweap Fault crosses the northwestern area and is one of the most active faults in Arizona. Due to the relative prevalence of seismic activity, scientists have studied the area to better understand tectonism and faulting, the geologic history of the Colorado Plateau, and the hydrologic history of the Colorado River. Similarly, the Kanab Plateau, also in the northwestern area, has been important for studies of faulting and tectonism, stratigraphy and sediment deposition, and hydrology.

In the northeastern area, scientists have studied the House Rock Valley, known in the Southern Paiute language as Aesak, meaning "basket shaped," to understand patterns of deposition and erosion. Stratigraphy—the study of rock layers—in this area has been important for developing a broader understanding of how the Grand Canyon formed.

In the southern area, the Coconino Plateau provides important opportunities to enhance understanding of tectonic uplift, canyon incision, and hydrological dynamics of regional aquifers. Over time, studies of the landscape's geology have also helped improve understanding of the geologic history of the Grand Canyon and Colorado Plateau as a whole. These studies have produced new theories regarding when and how the geologic structures in the area formed or eroded. Sites in this landscape have also been instrumental to long-term scientific studies of air pollution, airborne particulates, and visibility, as well as to studies on the use of satellite imagery to map geological formations. Paleontological resources are also found throughout the area, with fossils documented in written scientific literature for nearly 150 years. The Kanab Creek area in particular is known for brachiopod fossils that date back to the Carboniferous period.

The areas to the northeast, northwest, and south of the Grand Canyon are home to an abundant diversity of plant and animal species of scientific interest. Spanning a vast and unique range of geological and ecological systems, the areas showcase ecological transitions, ranging from the Mojave Desert and riparian habitats at low

15

elevations; to Great Basin grassland, Great Basin woodland, and Great Basin desert scrubland at intermediate elevations; to Rocky Mountain subalpine conifer forests, subalpine grasslands, and montane conifer forests at higher elevations. Ponderosa pine stands, some with old growth characteristics, can also be found at higher elevations.

Riparian vegetation in the area is rare and precious in this largely arid region. The northwest area houses parts of Kanab Creek, a stream with largely intermittent flow that is home to native riparian plant species. The occasional perennial pools help to support the Kaibab National Forest's only cottonwood-willow riparian forest, an important habitat type in Arizona and the broader Southwest. Kanab Creek provides a habitat for federally **55336** listed bird species, including potentially the threatened western yellow-billed cuckoo and endangered southwestern willow flycatcher, both of which have been sighted nearby. The creek also provides a habitat for sensitive amphibian species, including potentially the northern leopard frog.

In the grasslands found throughout the northwestern and southern areas, dominant vegetation species include native grasses, shrubs such as sagebrush and saltbush, and nearby juniper woodlands and savannas. The southern area is home to endemic and sensitive plant species, such as the Arizona leatherflower, Arizona phlox, Tusayan rabbitbrush, and Morton wild buckwheat. Grassland mammals, such as the pronghorn, and birds and raptors, such as the ferruginous hawk and the western burrowing owl, can also be found there.

Within the Great Basin desert-scrub habitat of the northwestern and northeastern areas, shrub species such as sagebrush and rabbitbrush grow alongside native grasses, wildflowers and other forbs, and occasionally cacti. This habitat type is home to unique mammal species including the Townsend's ground squirrel, the northern grasshopper mouse, and the more broadly distributed mule deer and bighorn sheep. Birds and reptiles characteristic of this community include the sage thrasher, sage sparrow, desert horned lizard, and Great Basin and Plateau tiger whiptails. The northeastern area also includes a portion of an important fall raptor migration route. The endangered Brady pincushion cactus and candidate species Paradine plains cactus, along with the sensitive Marble Canyon milkvetch and Paria Plateau fishhook cactus, can all be found in the northeastern area. The Siler pincushion cactus can be found in the far reaches of the northwestern area, particularly in the Moonshine Ridge and Johnson Springs Areas of Critical Environmental Concern.

Piñtilde»on and juniper woodlands are present at intermediate elevations and are particularly prevalent in the northwestern and southern areas. The piñtilde»on and juniper trees are accompanied by a sparse understory of native grasses and shrubs. This community is home to birds such as the pinyon jay and juniper titmouse. Along with characteristic reptiles and small mammals, this ecosystem also provides important winter range for elk and mule deer.

Petran montane conifer forests are found at the highest elevations, primarily in the southern area. Ponderosa pine dominates these forests, but Douglas fir, white fir, Gambel oak, and other tree and brush species can also be found there. Several mammal species are dependent on ponderosa pine, including the Abert's squirrel. Bird species representative of this area include the northern goshawk, Merriam's turkey, and a variety of raptors and neotropical migratory songbirds. Elk and mountain lions are also found there.

The landscape is also home to other significant species of scientific interest. The endemic Grand Canyon ringlet butterfly and Tusayan rabbitbrush are present in the southern area, as may be the endangered and endemic Sentry milkvetch. The endangered Fickeisen plains cactus can be found in all three areas. The endemic Kaibab monkey grasshopper occasionally can be found along the eastern edge of the Kaibab uplift in the northeastern area. The endemic Grand Canyon rose, which has been identified as at risk by the BLM (termed BLM-sensitive), can be found in the northwestern area, the northeastern area, and potentially also the southern area.

The area provides an important habitat for many notable mammal species, including desert bighorn sheep, which frequent canyons in the area. Kanab Creek's Hack Canyon is one of two canyons where sheep were extirpated and reintroduced in the 1980s, and the population there is studied for its contributions to genetic diversity of the species and to enhance understanding of predation by mountain lions. Pronghorn, elk, bison, and mountain lions can be found on and around the area's plateaus, in addition to mule deer, which travel through the northwestern and northeastern areas as part of an important migratory corridor. The sensitive Allen's lappet-browed *55337 bat, along with five other sensitive bat species, can be found in the northeastern and northwestern areas, and possibly the southern area as well, and the endemic and sensitive House Rock Valley chisel-toothed kangaroo rat can be found in the northeastern area. The House Rock Wildlife Area, part of which falls within the northeastern area, contains a herd of bison that is an important contributor to the genetic diversity of bison populations across the United States. House Rock also provides a habitat for pronghorn and a winter range for mule deer.

17

Cliffs and rock outcrops throughout the landscapes are home to unique birds including peregrine falcons, bald eagles, golden eagles, and a reintroduced population of endangered California condors. The threatened Mexican spotted owl nests in the northwestern area. Over time, the area has been scientifically important for ecological studies of climate change, ecosystem ecology, vegetation communities, historical fire regimes, and bat ecology. The area also contains all or portions of five separate habitat linkages identified as important to wildlife habitat connectivity and threatened by development by the Arizona Wildlife Linkages Workgroup, a working group of public and private organizations and agencies in Arizona.

In addition to sustaining Indigenous peoples, vegetation, and wildlife since time immemorial, the northeastern, northwestern, and southern areas also have supported more recent Euro-American settlers. For example, visitors to the northwestern part of this area can trace the route taken by the 1776 Dominguez-Escalante expedition in search of a northern route between Santa Fe and Monterrey. Mormon settlers in the late 19th century developed the Honeymoon Trail in the northeastern area to travel between their homes in Arizona and the temple in St. George, Utah, following trails used by Tribal Nations to access sites such as Deer and House Rock Springs.

These settlers, along with early miners, loggers, and ranchers, left behind scattered remnants of their presence throughout the areas. Hull Cabin, built in 1889 by sheep ranchers within the southern area and near the South Rim of the Grand Canyon, is listed on the National Register of Historic Places. The cabin is currently maintained for visitors and memorializes the area's early ranching and early Forest Service administrative use of the area. The Emerald/Anita mine and associated Camp Anita, which briefly operated at the end of the 19th century, evidences Arizona's copper mining history, while the Apex Logging Camp contains evidence of the timber industry between 1928 and 1936 and is the focus of ongoing research by an archaeological field school. Located at the top of the steepest grade on the Grand Canyon Railroad line, the town of Apex was once the headquarters camp of the Saginaw and Manistee Lumber Company and provided wood that was used to build the railroad, timber the mines, and construct the resorts along the South Rim of the Grand Canyon. Remnants of these structures, such as the foundation of a one-room school house constructed from two converted box cars, building platforms, domestic trash scatters, and railroad beds can still be seen today and help tell the story of Apex and its outlying camps, which between 1928 and 1936 provided a home for lumberjacks and locomotive crews.

18

The southern area also includes three other noteworthy historic sites: The decommissioned Red Butte Airfield, which is listed on the National Register of Historic Places, operated in the 1920s to bring visitors, including celebrities like Amelia Earhart, Charles Lindbergh, and Will Rogers, to view the wonders of the Grand Canyon. The Grandview Lookout Tower and its two-room cabin, located near the South Rim of the Grand Canyon, were built by the Civilian Conservation Corps in 1936 to aid the Forest Service and the National Park Service in detecting wildland fires. And the Tusayan Ranger Station, which is also listed on the National Register of Historic Places, comprises six historic buildings constructed between 1939 and 1942, including a house, a barn, and a corral.

Protecting the areas to the northeast, northwest, and south of the Grand Canyon will preserve an important spiritual, cultural, prehistoric, and historic **55338** legacy; maintain a diverse array of natural and scientific resources; and help ensure that the prehistoric, historic, and scientific value of the areas endures for the benefit of all Americans. As described above, the areas contain numerous objects of historic and scientific interest, and they provide exceptional outdoor recreational opportunities, including hiking, hunting, fishing, biking, horseback riding, backpacking, scenic driving, and wildlife-viewing, all of which are important to the travel- and tourism-based economy of the region.

WHEREAS, section 320301 of title 54, United States Code (the "Antiquities Act"), authorizes the President, in his discretion, to declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated upon the lands owned or controlled by the Federal Government to be national monuments, and to reserve as a part thereof parcels of land, the limits of which shall be confined to the smallest area compatible with the proper care and management of the objects to be protected; and

WHEREAS, the landscapes of the areas to the northeast, northwest, and south of the Grand Canyon have been profoundly sacred to Tribal Nations and Indigenous peoples of the Southwest since time immemorial; and

WHEREAS, I find that the unique historic and scientific characteristics of the landscapes, and the collection of objects and resources therein, make the landscapes more than the mere sum of their parts, and thus the entire landscapes within the boundaries of each area reserved by this proclamation are themselves objects of historic and scientific interest in need of protection under section 320301 of title 54, United States Code; and

19

WHEREAS, I find that all the objects identified above are objects of historic or scientific interest in need of protection under section 320301 of title 54, United States Code, regardless of whether they are expressly identified as objects of historic or scientific interest in the text of this proclamation; and

WHEREAS, I find that there are threats to the objects identified above, and, in the absence of a reservation under the Antiquities Act, these objects are not adequately protected by the current withdrawal, administrative designations, or otherwise applicable law because current protections do not require executive departments and agencies (agencies) to ensure the proper care and management of the objects and some objects fall outside of the boundaries of the current withdrawal; thus a national monument reserving the lands identified herein is necessary to protect the objects of historic and scientific interest identified above for current and future generations; and

WHEREAS, I find that the boundaries of the monument reserved by this proclamation represent the smallest area compatible with the proper care and management of the objects of scientific or historic interest identified above, as required by the Antiquities Act, including the landscapes within the boundaries of the three areas reserved and, independently, the collection of objects within those landscapes; and

WHEREAS, it is in the public interest to ensure the preservation, restoration, and protection of the objects of scientific and historic interest identified above, including the entire landscapes within the boundaries reserved by this proclamation;

NOW, THEREFORE, I, JOSEPH R. BIDEN JR., President of the United States of America, by the authority vested in me by section 320301 of title 54, United States Code, hereby proclaim the objects identified above that are situated upon lands and interests in lands owned or controlled by the Federal Government to be the Baaj Nwaavjo I'tah Kukveni—Ancestral Footprints of the Grand Canyon National Monument (monument) and, for the purpose of protecting those objects, reserve as part thereof all lands and interests in lands that are owned or controlled by the Federal Government within the boundaries described on the accompanying map, which is attached **55339** hereto and forms a part of this proclamation. These reserved Federal lands and interests in lands encompass approximately 917,618 acres. As a result of the distribution of the objects across the Baaj Nwaavjo I'tah Kukveni—Ancestral Footprints of the Grand Canyon areas, and additionally and independently, because the landscapes within each of the three monument areas are objects of scientific and historic interest in need of protection, the boundaries

20

described on the accompanying map are confined to the smallest area compatible with the proper care and management of the objects of historic or scientific interest identified above.

All Federal lands and interests in lands within the boundaries of the monument are hereby appropriated and withdrawn from all forms of entry, location, selection, sale, or other disposition under the public land laws or laws applicable to the Forest Service, other than by exchange that furthers the protective purposes of the monument; from location, entry, and patent under the mining laws; and from disposition under all laws relating to mineral and geothermal leasing.

This proclamation is subject to valid existing rights. If the Federal Government subsequently acquires any lands or interests in lands not currently owned or controlled by the Federal Government within the boundaries described on the accompanying map, such lands and interests in lands shall be reserved as a part of the monument, and objects of the type identified above that are situated upon those lands and interests in lands shall be part of the monument, upon acquisition of ownership or control by the Federal Government.

Nothing in this proclamation shall be construed to alter the valid existing water rights of any party, including the United States, or to alter or affect agreements governing the management and administration of the Colorado River, including any existing interstate water compact.

The Secretary of the Interior and the Secretary of Agriculture (Secretaries) shall manage the monument through the BLM and Forest Service, respectively, in accordance with the terms, conditions, and management direction provided by this proclamation. The Forest Service shall manage the portion of the monument within the boundaries of the National Forest System and the BLM shall manage the remainder of the monument. The lands administered by the Forest Service shall be managed as part of the Kaibab National Forest. The lands administered by the BLM shall be managed as a unit of the National Landscape Conservation System.

For purposes of protecting and restoring the objects identified above, the Secretaries shall jointly prepare a management plan for the monument and shall promulgate such rules and regulations for the management of the monument as they deem appropriate for those purposes. The Secretaries, through the BLM and Forest Service, shall consult with other Federal land management agencies or agency components in the local area, including the National Park Service, in developing the management plan. In promulgating any management rules and regulations governing National Forest

System lands within the monument and developing the management plan, the Secretary of Agriculture, through the Forest Service, shall consult with the Secretary of the Interior, through the BLM.

The Secretaries shall provide for maximum public involvement in the development of the management plan, as well as consultation with federally recognized Tribal Nations and conferral with State and local governments. In preparing the management plan, the Secretaries shall take into account, to the maximum extent practicable, maintaining the undeveloped character of the lands within the monument; minimizing impacts from surface-disturbing activities; providing appropriate access for livestock grazing, recreation, hunting, fishing, dispersed camping, wildlife management, and scientific research; and emphasizing the retention of natural quiet, dark night skies and scenic attributes of the landscape. In the development and implementation of the management plan, the Secretaries shall maximize opportunities, pursuant to applicable legal authorities, for shared resources, operational **\*55340** efficiency, and cooperation, and shall, to the maximum extent practicable, carefully incorporate the Indigenous Knowledge or special expertise offered by Tribal Nations and work with Tribal Nations to appropriately protect that knowledge.

The Secretaries shall explore opportunities for Tribal Nations to participate in co-stewardship of the monument; explore entering into cooperative agreements or, pursuant to the Indian Self-Determination and Education Assistance Act, 25 U.S.C. 5301 et seq., contracts with Tribes or Tribal organizations to perform administrative or management functions within the monument; and explore providing technical and financial assistance to improve the capacity of Tribal Nations to develop, enter into, and carry out activities under such cooperative agreements or contracts. The Secretaries shall further explore opportunities for funding agreements with Tribal Nations relating to the management and protection of traditional cultural properties and other culturally significant programming associated with the monument.

The Secretaries shall consider appropriate mechanisms to provide for temporary closures to the general public of specific portions of the monument to protect the privacy of cultural, religious, and gathering activities of members of Tribal Nations.

The Secretaries, through the BLM and Forest Service, shall establish an advisory committee under the Federal Advisory Committee Act, 5 U.S.C. 1001 et seq., to provide information and advice regarding the development of the management plan and, as appropriate, management of the monument. The advisory committee shall consist of a fair and balanced representation of interested stakeholders, including the

22

Arizona Game and Fish Department; other State agencies and local governments; Tribal Nations; recreational users; conservation organizations; wildlife, hunting, and fishing organizations; the scientific community; the ranching community; business owners; and the general public in the region.

In recognition of the importance of collaboration with Tribal Nations to the proper care and management of the objects identified above, and to ensure that management of the monument reflects tribal expertise and Indigenous Knowledge, a Baaj Nwaavjo I'tah Kukveni—Ancestral Footprints of the Grand Canyon Commission (Commission) is hereby established to provide guidance and recommendations on the development and implementation of the management plan and on the management of the monument. The Commission shall consist of one elected officer each from any Tribal Nation with ancestral ties to the area that has entered a cooperative agreement or similar arrangement with the Secretaries, through the BLM or Forest Service, in which the Tribal Nation and the Secretaries agree to co-stewardship of the monument through shared responsibilities or administration; has expressed, by Tribal resolution, an intention to join the Commission; and has designated an elected officer as the respective Tribe's representative. The Commission may adopt such procedures as it deems necessary to govern its activities, so that it may effectively partner with agencies by making continuing contributions to inform decisions regarding the management of the monument. The Secretaries shall explore opportunities to provide support to the Commission to enable participation in the planning and management of the monument.

The Secretaries shall meaningfully engage the Commission, or, should the Commission no longer exist, the relevant Tribal Nations through some other entity composed of one elected Tribal government officer from each of the Tribes represented on the Commission (comparable entity), in the development of the management plan and to inform the subsequent management of the monument. To that end, the Secretaries shall, in developing, revising, or amending the management plan, carefully and fully consider integrating the Indigenous Knowledge and special expertise of the members of the Commission or comparable entity. The management plan for the monument shall also set forth parameters for continued meaningful engagement with **\*55341** the Commission or comparable entity in the implementation of the management plan.

Nothing in this proclamation shall be deemed to alter, modify, abrogate, enlarge, or diminish the rights or jurisdiction of any Tribal Nation. The Secretaries shall, to the maximum extent permitted by law and in consultation with Tribal Nations, ensure the protection of sacred sites and cultural properties and sites in the monument and

23

shall provide access to Tribal members for traditional cultural, spiritual, and customary uses, consistent with the American Indian Religious Freedom Act (42 U.S.C. 1996), the Religious Freedom Restoration Act (42 U.S.C. 2000bb et seq.), Executive Order 13007 of May 24, 1996 (Indian Sacred Sites), and the November 10, 2021, Memorandum of Understanding Regarding Interagency Coordination and Collaboration for the Protection of Indigenous Sacred Sites. Such uses shall include, but are not limited to, the collection of medicines, berries, plants and other vegetation for cradle boards and other purposes, and firewood for ceremonial practices and personal noncommercial use, so long as each use is carried out in a manner consistent with the proper care and management of the objects identified above.

Nothing in this proclamation shall be construed to preclude the renewal or assignment of, or interfere with the operation, maintenance, replacement, modification, upgrade, or access to, existing or previously approved flood control, utility, pipeline, and telecommunications sites or facilities; roads or highway corridors; seismic monitoring facilities; wildlife management structures; or water infrastructure, including wildlife water developments or water district facilities, within the boundaries of existing or previously approved authorizations within the monument. Existing or previously approved flood control, utility, pipeline, telecommunications, and seismic monitoring facilities; roads or highway corridors; wildlife management structures; and water infrastructure, including wildlife water developments or water district facilities, may be expanded, and new facilities of such kind may be constructed, to the extent consistent with the proper care and management of the objects identified above and subject to the Secretaries' authorities, other applicable law, and the provisions of this proclamation related to roads and trails.

For purposes of protecting and restoring the objects identified above, the Secretaries shall prepare a transportation plan that designates the roads and trails on which motorized and non-motorized mechanized vehicle use, including mountain biking, will be allowed. The transportation plan shall include management decisions, including road closures and travel restrictions consistent with applicable law, necessary to protect the objects identified in this proclamation. Except for emergency purposes, authorized administrative purposes, wildlife management conducted by the Arizona Game and Fish Department, and the retrieval of legally harvested elk and bison, which are otherwise consistent with applicable law, motorized vehicle use in the monument may be permitted only on roads and trails documented as existing in BLM and Forest Service route inventories that exist as of the date of this proclamation. Any additional roads or trails designated for motorized

24

vehicle use must be designated only for public safety needs or the protection of the objects identified above.

The Secretaries shall explore mechanisms, consistent with applicable law, to enable the protection of Indigenous Knowledge or other information relating to the nature and specific location of cultural resources within the monument and, to the extent practicable, shall explain any limitations on the ability to protect such information from disclosure before it is shared with agencies.

Nothing in this proclamation shall be deemed to prohibit grazing pursuant to existing leases or permits within the monument, or the renewal or assignment of such leases or permits, which the BLM and Forest Service shall continue to manage pursuant to their respective laws, regulations, and policies.

**\*55342** Nothing in this proclamation shall affect the BLM's or Forest Service's ability to authorize access to and remediation or monitoring of contaminated lands within the monument, including for remediation of mine, mill, or tailing sites, or for the restoration of natural resources.

Nothing in this proclamation shall preclude low-level overflights of military aircraft, flight testing or evaluation, the designation of new units of special use airspace, the use or establishment of military flight training routes, or low-level overflights and landings for wildlife management conducted by the Arizona Game and Fish Department over the lands reserved by this proclamation. Nothing in this proclamation shall preclude air or ground access to existing or new electronic tracking communications sites associated with special use airspace and military training routes.

Nothing in this proclamation shall be deemed to enlarge or diminish the jurisdiction or authority of the State of Arizona with respect to fish and wildlife management, including hunting and fishing, on the lands reserved by this proclamation, or to affect the State's access to the monument for wildlife management, including access prior to and during the development of the management and transportation plans provided for above. The Secretaries shall seek to develop and implement science-based habitat and ecological restoration projects within the monument and shall seek to collaborate with the State of Arizona on wildlife management within the monument, including through the development of new, or the continuation of existing, memoranda of understanding with the Arizona Game and Fish Department.

The Secretaries may carry out vegetative management treatments within the monument to the extent consistent with the proper care and management of the objects identified above, with a focus on addressing ecological restoration; wildlife connectivity; or the risk of wildfire, insect infestation, invasive species, or disease that would endanger the objects identified in this proclamation or imperil public safety. Nothing in this proclamation shall be construed to alter the authority of any party with respect to the use of prescribed fire within the monument.

Nothing in this proclamation shall be construed to alter the authority or responsibility of any party with respect to emergency response activities within the monument, including wildland fire response.

Nothing in this proclamation shall be deemed to revoke any existing withdrawal, reservation, or appropriation; however, the monument shall be the dominant reservation.

Warning is hereby given to all unauthorized persons not to appropriate, injure, destroy, or remove any feature of the monument and not to locate or settle upon any of the lands thereof.

If any provision of this proclamation, including its application to a particular parcel of land, is held to be invalid, the remainder of this proclamation and its application to other parcels of land shall not be affected thereby.

**\*55343** IN WITNESS WHEREOF, I have hereunto set my hand this eighth day of August, in the year of our Lord two thousand twenty-three, and of the Independence of the United States of America the two hundred and forty-eighth.



Baaj Nwaavjo I'tah Kukveni - Ancestral Footprints of the Grand Canyon National Monument