**Case No. 25-1370**

---

## THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

ARIZONA STATE LEGISLATURE, by and through the President of the
Arizona Senate, Warren Peterson, and the Speaker of the Arizona House of
Representatives, Steve Montenegro; et al.,

*Plaintiffs - Appellants,*

*v.*

JOSEPH R. BIDEN, in his official capacity as President of the United States;
et al.,

*Defendants - Appellees,*

STATE OF ARIZONA, and KATIE HOBBS, Governor of Arizona, et al.,

*Intervenor-Defendants - Appellees.*

---

On Appeal from the United States District Court
for the District of Arizona

No. 3:24-cv-08026

---

## ANSWERING BRIEF OF STATE OF ARIZONA AND GOVERNOR HOBBS

---

Alexander Samuels (028926)
Clinten Garrett (022457)
Joshua A. Katz (039449)
OFFICE OF THE ARIZONA
ATTORNEY GENERAL
2005 N. Central Ave.
Phoenix, AZ 85004
(602) 542-3333
Alexander.Samuels@azag.gov
Clinten.Garrett@azag.gov
Joshua.Katz@azag.gov
ACL@azag.gov

*Attorneys for Intervenor-Defendant - Appellee*
*State of Arizona*

Sean Berens (034302)
Emily Brailey (039273)
OFFICE OF ARIZONA GOVERNOR
KATIE HOBBS
1700 West Washington St., 9TH Fl.
Phoenix, AZ 85004
(602) 542-6578
sberens@az.gov
ebrailey@az.gov

*Attorneys for Intervenor-Defendant - Appellee*
*Arizona Governor Katie Hobbs*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ..................................................................... i

TABLE OF AUTHORITIES ............................................................ iv

INTRODUCTION .......................................................................... 1

STATEMENT OF ISSUES ............................................................. 3

STATEMENT OF THE CASE ........................................................ 4

I.     Factual background. ............................................................. 4

      A.    Northern Arizona has long included vast swaths of both federal land and State Trust Land. ................................. 4

      B.    President Biden designates the Ancestral Footprints Monument. ............................................................ 5

II.    Procedural history ................................................................ 8

      A.    Governmental Plaintiffs and a private party sue to stop the Monument. .................................................... 8

      B.    The district court dismisses the case for lack of standing and only the governmental Plaintiffs appeal. ................ 8

STANDARD OF REVIEW .............................................................. 10

SUMMARY OF ARGUMENT ........................................................ 11

ARGUMENT ................................................................................. 15

I.     Plaintiffs cannot sue to redress the State's injuries. ................ 15

      A.    The Monument does not impact—let alone injure—the Legislature's institutional power. ............................... 17

i

B.    All relevant authority cited by both sides confirms the Legislature's lack of standing. .......................................................20

C.    Any purported injury is extremely speculative...........................24

II.    Plaintiffs' additional standing arguments are unavailing...................25

A.    Alleged generalized economic loss does not confer standing..........................................................................................25

1.    The Legislature and the Treasurer do not suffer economic injury when State revenue fluctuates...............26

2.    Alleged generalized tax loss does not confer standing. ....................................................................................27

3.    Plaintiffs have not adequately alleged any other economic injury. ....................................................................30

4.    Temporal remoteness renders Plaintiffs' claim even more speculative. ...........................................................33

5.    Plaintiffs cannot invent new allegations about immediate harm. ....................................................................36

6.    Plaintiffs' claims are not redressable...................................37

B.    Appellants cannot establish harm based on diversion of resources. ..........................................................................................38

1.    Diversion of resources alone is insufficient to establish standing...................................................................38

2.    Plaintiffs' claim could not survive the most forgiving standards, let alone *Hippocratic Medicine's* requirements. ........................................................39

3.    Plaintiffs' criticism of the district court's opinion is meritless...................................................................................42

C.    Plaintiffs' purported concern about water rights does not
      confer standing. ...............................................................43

D.    Plaintiffs do not have standing as energy consumers. ...............45

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Diabetes Ass'n v. United States Dep't of the Army,*
938 F.3d 1147 (9th Cir. 2019) ....................................................38, 40

*Arias v. DynCorp,*
752 F.3d 1011 (D.C. Cir. 2014) ................................................27

*Arizona Alliance for Retired Americans v. Mayes,*
117 F.4th 1165 (9th Cir. 2024) ................................................42

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n,*
576 U.S. 787 (2015) ................................................................21

*Belmont Abbey College v. Sebelius,*
878 F.Supp.2d 25 (D.D.C. 2012) ..........................................35, 36

*Berry v. Ariz. State Land Department,*
651 P.2d 853 (Ariz. 1982) ......................................................16

*Blanchette v. Connecticut Gen. Ins. Corps.,*
419 U.S. 102 (1974) ................................................................35

*Campbell v. Flying V Cattle Co.,*
220 P. 417 (Ariz. 1923) ..........................................................16

*Campbell v. Muleshoe Cattle Co.,*
212 P. 381 (Ariz. 1923) ..........................................................18

*Citizens United v. Fed. Election Comm'n,*
558 U.S. 310 (2010) ............................................................33, 34

*City of Sausalito v. O'Neill,*
386 F.3d 1186 (9th Cir. 2004) ................................................29

*City of Oakland v. Lynch,*
798 F.3d 1159 (9th Cir. 2015) ................................................28

*Clapper v. Amnesty Int'l USA,*
568 U.S. 310 (2013) ..............................................12, 15, 25, 45

*Davis v. Fed. Election Comm'n,*
554 U.S. 724 (2008) ................................................................32

*Drake v. Obama,*
664 F.3d 774 (9th Cir. 2011) ..................................................24

*FDA v. Alliance for Hippocratic Medicine,*
602 U.S. 367 (2024) ........................................2, 14, 38, 41, 42

iv

*Fisk v. Inslee,*
   759 F. App'x 632 (9th Cir. 2019)....................................................44

*Florida v. Mellon,*
   273 U.S. 12 (1927)..............................................................27, 33

*Forty-Seventh Legislature of the State of Arizona v. Napolitano,*
   143 P.3d 1023 (Ariz. 2006) ......................................................20

*Gonzales v. Gorsuch,*
   688 F.2d 1263 (9th Cir. 1982) ..................................................37

*Hollingsworth v. Perry,*
   570 U.S. 693 (2013)...............................................................16

*John v. United States,*
   720 F.3d 1214 (9th Cir. 2013) ..................................................43

*Karcher v. May,*
   484 U.S. 72 (1987) .................................................................24

*Kedzierski v. Kedzierski,*
   899 F.2d 681 (7th Cir. 1990) ...................................................33

*Kerr v. Hickenlooper,*
   824 F.3d 1207 (10th Cir. 2016) ...........................................22, 23

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest,*
   624 F.3d 1083 (9th Cir. 2010) ..................................................10

*Lake v. Fontes,*
   83 F.4th 1199 (9th Cir. 2023)...................................................25

*Lance v. Coffman,*
   549 U.S. 437 (2007)................................................................46

*McConnell v. Fed. Election Comm'n,*
   540 U.S. 93 (2003)............................................................33, 34

*Miller v. Block,*
   771 F.2d 347 (8th Cir. 1985) ...................................................28

*Nat'l R.R. Passenger Corps. v. Atchinson Topeka & Santa Fe Ry. Co.,*
   470 U.S. 451 (1985)................................................................11

*Nelsen v. King Cnty.,*
   895 F.2d 1248 (9th Cir. 1990) ..................................................31

*New York v. Yellen,*
   15 F.4th 569 (2d Cir. 2021) .....................................................27

*Newdow v. U.S. Congress,*
   313 F.3d 495 (9th Cir. 2002) ....................................18, 19, 21, 22

*Orangeburg, S.C. v. FERC*,
   862 F.3d 1071 (D.C. Cir. 2017) ........................................................... 35

*Priorities USA v. Nessel*,
   978 F.3d 976 (6th Cir. 2020) ................................................... 22, 23, 24

*Raines v. Byrd*,
   521 U.S. 811 (1997) .............................................................................. 20

*Sierra Club v. Trump*,
   977 F.3d 853 (9th Cir. 2020) ............................................................... 28

*Silver v. Babbitt*,
   166 F.R.D. 418 (D. Ariz. 1994) ........................................................... 16

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ....................................................................... 15, 25

*State ex rel. Woods v. Block*,
   942 P.2d 428 (Ariz. 1997) ................................................................... 19

*Steel Co. v. Citizens for a Better,*
   *Env.*, 523 U.S. 83 (1998) .................................................................... 15

*Tennessee Conference of NAACP v. Lee*,
   139 F.4th 557 (6th Cir. June 5, 2025) ................................................. 39

*Tennessee ex rel. Tenn. Gen. Assembly v. U.S. Dep't of State*,
   931 F.3d 499 (6th Cir. 2019) ......................................................... 22, 23

*Thomas More Law Ctr. v. Obama*,
   651 F.3d 529 (6th Cir. 2011) ............................................................... 34

*Toma v. Fontes*,
   553 P.3d 881 (Ariz. Ct. App. 2024) .................................................... 20

*Town of Chester, N.Y. v. Laroe Estates, Inc.*,
   581 U.S. 433 (2017) .............................................................................. 11

*Vacek v. U.S. Postal Serv.*,
   447 F.3d 1248 (9th Cir. 2006) ............................................................. 11

*Virginia House of Delegates v. Bethune-Hill*,
   587 U.S. 658 (2019) ....................................................................... 17, 19

*Whitmore v. Arkansas*,
   495 U.S. 149 (1990) .............................................................................. 45

*Wyoming v. Oklahoma*,
   502 U.S. 437 (1992) ....................................................................... 13, 27

*Yaw v. Del. River Basin Comm'n*,
   49 F.4th 302 (3d Cir. 2022) ........................................................... 22, 23

vi

*Yount v. Salazar*,
  2013 WL 93372 (D. Ariz. Jan. 8, 2013)................................................28, 30, 31

**Statutes and Constitutional Provisions**

35 Stat. 2175 ...................................................................................................5
98 Stat. 1485 ...................................................................................................5
Ariz. Const. art. III..........................................................................................19
Ariz. Const. art. 4 § 1......................................................................................26
Ariz. Const. art. 9 § 3......................................................................................26
Ariz. Const. art. 10 § 7....................................................................................26
A.R.S. § 37-102 .......................................................................................11, 16
A.R.S. § 41-193 .......................................................................................11, 16
A.R.S. § 45-453 ..............................................................................................44

**Rules**

Fed. R. Civ. P. 12...........................................................................................15
77 Fed. Reg. 2563 ............................................................................................5

## INTRODUCTION

The State of Arizona is the only party that can sue for injuries to the State Land Trust. The Arizona Legislature, by contrast, has no right to bring claims that, at bottom, belong to the State (and are meritless).

Against this backdrop, the Legislature and other Plaintiffs—the Arizona Treasurer, an Arizona county, and two Arizona cities—seek to undo the Ancestral Footprints Monument in northern Arizona by alleging that the Monument will harm adjacent State Trust Land, which will in turn cause them derivative institutional, economic, and resource-diversion injuries. Plaintiffs' standing theories fail as a matter of law and are also far too speculative and attenuated to support Article III standing.

Because the Legislature does not have standing to complain directly about harm to the State Land Trust—and because the Legislature's only constitutional role is to *legislate*—it first posits a causal chain where the Monument causes the State Land Trust to lose value, and then this diminished value strips the Legislature of institutional power by decreasing the amount of money in State coffers. But fluctuations in State revenue have no effect whatsoever on the Legislature's power to legislate, and no court has ever found legislative standing on such an outlandish basis.

1

Plaintiffs' additional standing theories similarly fail because in each instance a highly speculative chain leads only to nonexistent injury. As to tax-loss and other economic injury, Plaintiffs argue (at 13) that they will lose "prosperity and tax revenue." But tax-loss standing requires a plaintiff to allege the loss of *specific tax revenues*, and this comes nowhere close. Nor do Plaintiffs help themselves by relying on a twelve-year-old declaration with stale data from a different case.

Likewise, Plaintiffs continue to assert a resource-diversion claim that the Supreme Court disavowed in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), and that could not have survived under prior precedent in any event. As the district court observed, Plaintiffs' resource-diversion theory is based on work that is indistinguishable from their day-to-day jobs. And beyond that, Plaintiffs have never made any showing that governmental entities can get into court under organizational standing principles by complaining about changing public exigencies (a farfetched notion before *Hippocratic Medicine*, let alone after).

And Plaintiffs' final two standing theories—purported harm as water users and as energy consumers—are pure fantasy. The Proclamation that created the Monument expressly protects water rights, and musings that

2

uranium prices might go up sometime in the future and thereby injure them—seven years in the future, when the Proclamation's mining restrictions become operative—lack even nominal grounding in fact or law. Plaintiffs' arguments are also far too generalized to support standing, insofar as they ask the court to accept that any water or energy user—i.e., anyone—has standing to challenge a wide swath of government actions on that basis alone. That is obviously not the case.

This Court should affirm the district court's thorough and well-reasoned dismissal of this case.

## STATEMENT OF ISSUES

1. Does the Arizona Legislature have standing to sue over purported impacts on its legislative power arising from a federal Monument's alleged harm to the State Land Trust?

2. Do Plaintiffs have standing to sue over alleged generalized tax loss, alleged diversion of resources, or alleged impact on their water rights and energy consumption arising from a federal Monument's purported harm to the State Land Trust?

## STATEMENT OF THE CASE

### I.  Factual background.

Much of Plaintiffs' statement of the case is substantive argument that has no bearing on the narrow standing issues before the Court. For standing purposes, the material background facts are that the State administers State Trust Land; that the Proclamation expressly protects existing water and other rights; and that existing restrictions on mining in the Monument area will remain in effect until at least 2032 no matter what happens in this case.

### A.  Northern Arizona has long included vast swaths of both federal land and State Trust Land.

Congress and President Lincoln established the Territory of Arizona in 1863, and granted the Territory certain parcels of land at that time. 2-ER-277–78 ¶¶ 72-73. About fifty years later, the Arizona-New Mexico Enabling Act set aside additional state lands in connection with Arizona's statehood. *Id.* ¶¶ 75-76. As Plaintiffs acknowledge, "Arizona holds 'those granted lands in trust.'" *Id.* ¶ 78. The State therefore has a "duty as trustee of State Trust Lands." *Id.* 2-ER-303 ¶ 191(f); *see also id.* ¶ 191(g) ("Arizona's trustee status derives from federal law and the State Constitution").

In 1908, four years before Arizona's statehood, President Theodore Roosevelt designated the Grand Canyon a national monument. *See*

4

Proclamation No. 794, 35 Stat. 2175 (Jan. 11, 1908). After Arizona's statehood, Congress established the Grand Canyon as a national park in 1919. *See* 40 Stat. 1175 (1919).

More recently, President Ronald Reagan signed the Arizona Wilderness Act of 1984, which withdrew large swaths of federal land around the Grand Canyon and the Kaibab National Forest for preservation as wilderness areas.[1]  Arizona Wilderness Act of 1984, Pub. L. No. 98–406, 98 Stat. 1485. Over several decades, the government withdrew additional land for wilderness conservation in the same area, including a withdrawal of more than one million acres in 2012 for twenty years. *See* 77 Fed. Reg. 2563 (the "2012 Withdrawal") (withdrawing federal land in Coconino and Mohave Counties "to protect the Grand Canyon Watershed from adverse effects of locatable mineral exploration and development").

### B.    President Biden designates the Ancestral Footprints Monument.

In May 2023, Arizona Governor Katie Hobbs wrote President Biden to encourage his Administration to establish a national monument on

---

[1] *See* Act of May 29, 1830, 4 Stat. 420, 421 ("no entry or sale of any land shall be made, under the provisions of this act, which … is reserved from sale … by order of the President").

5

additional federal land around the Grand Canyon. 2-ER-304 ¶ 191(h). Governor Hobbs highlighted in her letter that the Grand Canyon provides nearly 10,000 jobs and is a huge economic contributor through tourism; that it is rich with history and heritage for the tribes that have inhabited the area for centuries; and that it provides millions of people with natural space to recreate. *Id*. ¶ 191(h) n. 25.

On August 8, 2023, President Biden established the Baaj Nwaavjo I'tah Kukveni-Ancestral Footprints of the Grand Canyon National Monument on federal land surrounding the Grand Canyon. 2-ER-289 ¶ 134; 88 Fed. Reg. 55,331 (Aug. 15, 2023) (the "Proclamation"). The Proclamation includes a detailed rationale for preserving the area's landscapes, including that the area's "unique historic and scientific characteristics" warrant protection. Irrespective of whether President Biden had issued the Proclamation, however, "no new action on mining claims could" have begun until 2032 under the 2012 Withdrawal. 2-ER-285 ¶¶ 113-14.

Certain parcels of State Trust Land are situated around the Grand Canyon National Park and surrounded by federal land included in the Ancestral Footprints Monument. Those State Trust Land parcels, however, are not part of the Monument designation, and the restrictions that apply to

6

federal land included in the Monument do not apply to State land. *See* Proclamation at 55,338 (stating that the President may only declare a monument on "lands owned or controlled by the Federal Government").

The Proclamation expressly provides that it shall not "be construed to alter the valid existing water rights of any party." *See* Proclamation at 55,339 (Proclamation does not "alter or affect agreements governing the management and administration of the Colorado River, including any existing interstate water compact"); 2-ER-301 ¶ 189 (acknowledging Monument's preservation of water rights).

The Proclamation also protects existing leasing rights. *See* Proclamation at 55,341 ("[n]othing in this proclamation shall be deemed to prohibit grazing pursuant to existing leases or permits within the monument, or the renewal or assignment of such leases or permits"); *id.* at 55,339 ("providing appropriate access for livestock grazing, recreation, hunting, fishing, dispersed camping, wildlife management, and scientific research" on the Monument). And the Proclamation maintains accessibility to State Trust lands. *Id.* at 55,341 (stating that roads and highway corridors will continue to be created, maintained, replaced, modified, upgraded, and expanded).

7

## II.    Procedural history

### A.    Governmental Plaintiffs and a private party sue to stop the Monument.

In February 2024, a group of governmental Plaintiffs—the Arizona Legislature, the Arizona Treasurer, Mohave County, Colorado City, and Fredonia—sued the Biden Administration, alleging that the Monument is unlawful and unconstitutional. 2-ER-315. Plaintiffs asked the district court to declare the Monument or the Antiquities Act itself unconstitutional, and to enjoin or "set aside" the Monument. *Id*. That same day, a private individual named Chris Heaton also sued to invalidate the Proclamation. *See* 1-ER-4.

Following consolidation of the cases, the court permitted the State and Governor Hobbs to intervene as defendants to protect the State's right to litigate State interests through the Attorney General. The federal defendants and the State and Governor moved separately for dismissal.

### B.    The district court dismisses the case for lack of standing and only the governmental Plaintiffs appeal.

On January 27, the district court granted the federal Defendants' motion to dismiss and denied the State's and Governor's motion as moot. 1-ER-2.

8

The court found that harms alleged by the Legislature arose from the "Monument's impact on Arizona's State Trust Lands," and that "the Legislature is not authorized to bring claims on behalf of the State." 1-ER-8. And while the Legislature tried "to derive an institutional injury … from the Proclamation's impact on the State," it "articulated no more than an abstract loss of sovereign authority over State Trust Lands." 1-ER-11. The Legislature's allegations therefore did "not approach the sort of direct, particularized harms … [that] have previously given rise to legislative standing." *Id.*; *see also* 1-ER-13 ("the Legislature's expansive view of legislative standing would run afoul of the separation of powers clause enumerated in Arizona's Constitution").

As to Plaintiffs' diversion of resources theory, the court stated that it was "unaware of any case in this circuit in which a diversion of resources theory of standing has been considered or accepted for a governmental plaintiff." 1-ER-17. And in any event, Plaintiffs' purported injuries were "indistinguishable from the due performance of their respective functions." 1-ER-18.

Likewise, Plaintiffs' purported economic injuries—primarily alleged in the form of lost tax revenue—"suffer[ed] from several deficiencies,"

including temporal remoteness and the reliance on declarations from a twelve-year-old case. 1-ER-22-24. And Plaintiffs' allegations regarding purported harm to their water rights—i.e., that the Proclamation created "ambiguity"—"failed to show a concrete or imminent injury relating to water rights." 1-ER-19. And the Proclamation itself provided that "[n]othing in this proclamation shall be construed to alter the valid existing water rights of any party[.]" *Id.* (quoting 99 Fed. Reg. 55,339).

Finally, Plaintiffs did not have standing as energy consumers because their "fears of potential geopolitical shifts" that could impact future uranium prices were "exceedingly speculative" and they spent "little of their Opposition brief" defending it. 1-ER-26-27.

The court separately found that Heaton, the private plaintiff, lacked standing. 1-ER-27-32. Only the governmental Plaintiffs appealed to this Court. 3-ER-319.

## STANDARD OF REVIEW

This Court reviews the district court's decision on standing de novo. *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1087 (9th Cir. 2010) (affirming dismissal for lack of standing). In conducting this review, "[i]t is to be presumed that [the] cause lies outside [the federal

10

courts'] limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Vacek v. U.S. Postal Serv.*, 447 F.3d 1248, 1250 (9th Cir. 2006) (cleaned up). That is true "for each claim" pressed in the district court and "for each form of relief that [was] sought." *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) (citation omitted).

## SUMMARY OF ARGUMENT

I.    The Arizona Legislature disagrees with President Biden's designation of the Ancestral Footprints Monument and has alleged that the designation will have various derivative impacts on the surrounding State Trust Land. The Legislature has no power to bring these claims. The State of Arizona holds State Trust Land in a fiduciary capacity, and the State—represented by the Attorney General—has the exclusive right to "commence, prosecute and defend" litigation to protect the Land Trust. A.R.S. § 37-102(A)-(C); A.R.S. § 41-193(A)(3).

By contrast, the Legislature's sole constitutional role is to legislate. *See Nat'l R.R. Passenger Corps. v. Atchinson Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 466 (1985). Lacking any cognizable interest in the alleged harm to State Trust Land, the Legislature argues (at 17) that the Monument has nonetheless "stripped … its prerogative" to legislate on matters relating to the State

11

Land's management and sale. The Legislature, however, has alleged nothing resembling "nullification" or "stripping" of its legislative power that could support standing. Rather, it is merely alleging that the Monument will somehow "affect" the Land Trust in an economically disadvantageous way, and that this constitutes sufficient impairment of the Legislature's ability to legislate. No case has ever found legislative standing on such a flimsy and illogical basis. And accepting the Legislature's argument that it has standing based on decreased revenues to the State would open the floodgates for a slew of lawsuits by legislative plaintiffs, bringing policy disagreements to the courts' doorsteps.

Legislative standing principles aside, the Legislature's claim also fails because it rests on a "highly attenuated chain of possibilities" and is therefore far too speculative to establish standing. *Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 410 (2013). The purported harms here are nowhere close to "certainly impending," and Plaintiffs' "allegations of possible future injury are not sufficient." *Id.* at 409 (cleaned up). Beyond the implausible chain of assumptions—i.e., that the Monument will impair the Land Trust's value and marketability, which will somehow impact the Legislature's prerogative—the 2012 Withdrawal bans mining on the Monument through

12

2032, in any event, rendering any purported injury remote and further negating the Court's ability to redress the alleged injury.

II.     Lacking any valid legislative injury theory, Plaintiffs put forward a hodgepodge of additional standing arguments that lack any colorable basis.

A.     *No standing based on economic injury*. Contrary to Plaintiffs' odd suggestion, the Legislature and the Treasurer have no proprietary interest in the Land Trust and have not suffered any economic injury of any sort.

Further, to establish standing based on reduced tax revenue, a plaintiff must allege the "loss of specific tax revenues." *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992). Plaintiffs' generalized allegations—e.g. (at 19), that the Proclamation "threatens their economic interests"—come nowhere close to an allegation of specific tax loss that would support standing here.

Plaintiffs' additional economic loss arguments—e.g., "budget shortfalls" (at 19)—amount to a repackaging of their defective tax-loss argument. And these arguments only highlight the complaint's deficiencies by relying exclusively on twelve-year-old data from a different case as their only purported support for standing.

13

B.   *No standing based on resource diversion*. The notion that "standing exists when an organization diverts its resources in response to a defendant's actions … is incorrect." *Hippocratic Medicine*, 602 U.S. at 395. Organizational plaintiffs must instead demonstrate interference with their "core business activities." *Id.*

Plaintiffs are governmental entities, not organizations, and they have never made any showing that organizational standing principles even apply to them. Regardless, as the district court correctly held, the activities that Plaintiffs characterize as resource-diversion injuries are indistinguishable from their regular duties as public servants.

C.   *No standing based on impaired water rights.* The Proclamation expressly provides that it does not "affect 'valid existing water rights of any part[y].'" 2-ER-301 ¶ 189 (citing 88 Fed. Reg. at 55,339). The allegations in Plaintiffs' complaint are therefore necessarily equivocal. *E.g.*, 2-ER-308 ¶ 194(b) ("[t]he Monument *raises concerns* about Colorado City's water supply") (emphasis added); 2-ER-301 ¶ 189 (Proclamation creates "*ambiguity* about water rights in the region") (emphasis added).

On appeal, these allegations have now evolved into the bare assertion (at 47) that a "conflict is likely to occur soon [that] will result in a restriction

14

in the water the Local Governments can pump." To the extent this is not imagined from whole cloth, it rests "on a highly attenuated chain of possibilities," and therefore cannot support standing. *Clapper*, 568 U.S. at 410.

D.    *No standing based on future energy threats.* Plaintiffs' assertion (at 48) "that the Proclamation will disrupt the energy supply and impose higher prices on them" is wildly speculative, attenuated, and generalized.

## ARGUMENT

## I.    Plaintiffs cannot sue to redress the State's injuries.

When a plaintiff lacks standing, the district court must dismiss under Fed. R. Civ. P. 12(b)(1) for lack of subject-matter jurisdiction. *Steel Co. v. Citizens for a Better Env.*, 523 U.S. 83, 101 (1998). And "[t]o establish injury in fact" sufficient for standing, "a plaintiff must show that [it] suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (cleaned up).

Even as the Legislature asserts that the "district court … erred in concluding that the Legislature was attempting to assert claims held by the State," it must necessarily admit that "*Arizona* holds state trust land in a

15

fiduciary capacity." Op. Br. at 33 (citing *Silver v. Babbitt*, 166 F.R.D. 418 (D. Ariz. 1994) (emphasis added)); *see also* 2-ER-303 ¶ 191(g) (same).

Thus, "[t]he administration, charge, and control of state land is vested in the state land department." 2-ER-303 ¶ 191(h) (quoting *Berry v. Ariz. State Land Department*, 651 P.2d 853, 855 (Ariz. 1982)); *see also Campbell v. Flying V Cattle Co.*, 220 P. 417, 418 (Ariz. 1923) (State Land Department has "complete authority to administer these lands"); A.R.S. § 37-102(B). Unsurprisingly then, it is the State Land Department—not the Legislature—that is authorized by law to "commence, prosecute and defend," on behalf of the State, "all actions" to protect State Trust Land and proceeds therefrom. A.R.S. § 37-102(A)-(C). And the Attorney General "[r]epresent[s] this state in any action in a federal court." A.R.S. § 41-193(A)(3).

Thus, any harms to the State are not the Legislature's to assert. And the parties who could assert them all agree that Arizona is not being injured by the proclamation. The Legislature's various efforts to transform alleged harm to the State Land Trust into institutional legislative injury are therefore meritless. *See Hollingsworth v. Perry*, 570 U.S. 693, 707–08 (2013) (petitioners could not assert state's "judicially cognizable interest" without suffering an injury in fact themselves). Nor may the Legislature stand in the State's shoes

16

by claiming to represent it. *See Virginia House of Delegates v. Bethune-Hill*, 587 U.S. 658, 663 (2019) (House of Delegates lacked standing to "represent the State's interests" where state selected a different agent).

### A. The Monument does not impact—let alone injure—the Legislature's institutional power.

The Legislature argues (at 17) that it has standing because "the Supreme Court and several Circuits have recognized that a state legislature has standing when stripped of its prerogative to act." There are numerous problems with this argument, starting with the reality that the Legislature is complaining about a federal Monument's purported impact on State Trust Land—none of which has any logical bearing whatsoever on the Legislature's "prerogative to act," as the Legislature's own attempt to explain its theory confirms.

According to the Legislature, the Land Trust's "purpose" is "the revenues it generates," and the "[t]he Enabling Act gave to the Legislature the power of determining … how to achieve that purpose" in relation to the "dispos[al] … or lease [of] the land." Op. Br. at 33 (cleaned up); *id.* at 32 ("duty under the Enabling Act and Arizona Constitution to maximize the funds from the State Trust Land").

17

The Legislature then argues that its purported injury (at 34) is that "landlocking State Trust Land within the Ancestral Footprints Monument restricts the ability to sell or lease the land and reduces its value." The Legislature also argues (at 35) that "entry restrictions on Monument land that bar travel to interior Trust Land effectively nullif[y]" the "statutory scheme" governing "improvements on State Trust Land." And the Legislature asserts (at 36) that it is "akin to a trustee over the State Trust Land."

But as the Legislature necessarily admits, its actual role under "the Enabling Act and Arizona Constitution" is "to *enact proper laws* for the sale of state lands, or the leasing thereof." *Id.* at 34 (quoting *Campbell v. Muleshoe Cattle Co.*, 212 P. 381, 382 (Ariz. 1923)) (emphasis added); *id.* at 35 ("The Legislature *created a statutory scheme* establishing how a lessee can put improvements on State Trust Land."). Once a law is passed, it "is not the [legislature's] any more than it is the law of any other citizen or group of citizens in the United States." *Newdow v. U.S. Congress*, 313 F.3d 495, 498-99 (9th Cir. 2002) (no legislative standing in relation to "the behavior of the citizenry in general"). And a legislature "suffers no legally cognizable injury

from" variations in "the content" of future legislation. *Bethune-Hill*, 587 U.S. at 669-70 n.6.

The Legislature is therefore not "akin" to a trustee—let alone actually a trustee—in any respect. And legislative bodies do not have "roving commission[s] to enter every case involving the constitutionality of statutes," *Newdow*, 313 F.3d at 499, let alone to complain about a derivative impact on state laws.

This is especially true in Arizona, where the separation of powers is part of a "system of structured liberty" that is "[n]owhere in the United States … more explicitly and firmly expressed." *State ex rel. Woods v. Block*, 942 P.2d 428, 434 (Ariz. 1997); Ariz. Const. art. III (Arizona has three "separate and distinct" branches that cannot "exercise the powers properly belonging to either of the others"). And "[c]onducting litigation on behalf of the state, as authorized by the Legislature, is an executive function." *Woods*, 942 P.2d at 436 (holding unconstitutional a "legislative body performing an executive function").

As the district court correctly held, "Plaintiffs' Enabling Act arguments rely on an authority which the Legislature conferred on Arizona's State Land

Department more than a century ago," 1-ER-12, and are therefore unavailing.

## B. All relevant authority cited by both sides confirms the Legislature's lack of standing.

The Legislature (at 30) faults the district court for stating that legislative standing generally requires the legislative vote to be threatened or nullified, but that is exactly what all the controlling authority holds. *See, e.g., Raines v. Byrd*, 521 U.S. 811, 826 (1997) (nullification, not "abstract dilution," is required for standing); *Forty-Seventh Legislature of the State of Arizona v. Napolitano*, 143 P.3d 1023, 1025, 1027–28 ¶¶ 1, 14-15 (Ariz. 2006) (Legislature had standing because it challenged the constitutionality of a gubernatorial veto that caused "a direct injury to [the Legislature's] authority to make and amend laws by a majority vote"); *Toma v. Fontes*, 553 P.3d 881, 892-94 ¶¶ 44-55 (Ariz. Ct. App. 2024), *review granted* (Jan. 7, 2025) (legislature had standing to challenge voter-approved proposition that "prohibit[ed] it from passing any legislation" on a particular matter and thus "nullifie[d] its authority," but it lacked standing to challenge other provisions that did not nullify its authority).

In *Arizona State Legislature v. Arizona Independent Redistricting Comm'n*, the Legislature challenged a ballot measure that would have "remov[ed] redistricting authority from the Arizona Legislature and vest[ed] that authority in an independent commission." 576 U.S. 787, 792 (2015). The Supreme Court held that the Legislature had standing because the initiative at issue would have "completely nullif[ied] any vote by the Legislature, now or in the future, purporting to adopt a redistricting plan." *Id.* at 803–04 (cleaned up).

The Legislature nonetheless asserts (at 30) that *Arizona State Legislature* actually stands for the proposition that a legislature has standing when it is "stripped of its 'prerogative to initiate redistricting.'" But the Legislature is simply quoting different language from the case, and the respective terms—nullification and prerogative stripping—are materially identical in meaning. The Legislature's power in this case has neither been "stripped" nor "nullified."

Likewise, the Legislature (at 30-31) relies on *Newdow* without mentioning that this Court denied Congress's motion to intervene in that case because only the executive branch—through the Attorney General—had standing to defend the constitutionality of a law that Congress had

21

enacted. 313 F.3d at 499-500. As the Court explained, "every time a statute is not followed or is declared unconstitutional, the votes of legislators are mooted and the power of the legislature is circumscribed in a sense, but that is no more than a facet of the generalized harm that occurs to the government as a whole." *Id.* at 500.

The further suggestion (at 31) that "[s]ister Circuits have applied a much broader interpretation [of legislative standing] than the district court" is also wrong, as the Legislature's own citations reveal. The Legislature admits, for example (at 31), that *Tennessee ex rel. Tennessee General Assembly v. United States Dep't of State* held that a legislature must show "a disruption to [the] body's *specific powers*" to establish standing. 931 F.3d 499, 511-12 (6th Cir. 2019) (emphasis added and cleaned up); *see also Priorities USA v. Nessel*, 978 F.3d 976, 982 (6th Cir. 2020) (disruption of "*powers* to regulate elections") (emphasis added); *Kerr v. Hickenlooper*, 824 F.3d 1207, 1214 (10th Cir. 2016) ("injury to the *power* of the legislature") (emphasis added); *Yaw v. Del. River Basin Comm'n*, 49 F.4th 302, 314 (3d Cir. 2022) ("loss of legislative *power*") (emphasis added).

Nor are the results in those cases helpful to the Legislature. In *Tennessee General Assembly*, the Sixth Circuit affirmed the district court's dismissal of

22

General Assembly's claims because those claims, like the Legislature's here, "alleged injury to the state." *Id.* at 513.

In *Kerr*, members of the Colorado legislature challenged a voter initiative that precluded the legislature from raising taxes without voter approval. 824 F.3d at 1211. While the court suggested that the legislature would have had standing under *Arizona Legislature* because it had been stripped of power, the court held that individual legislators lacked standing. *Id.* at 1216-17. Likewise, in *Yaw*, the Third Circuit held that individual members of the Pennsylvania senate lacked standing to challenge a state commission's ban on fracking. 49 F.4th at 314. While the court characterized the members' allegations as "sound[ing] in a general loss of legislative power," *id.*, it did not analyze (let alone decide) whether those allegations actually would have established the full legislature's standing.

And the encroachments on legislative power in cases where courts found standing bear no resemblance whatsoever to the facts here. In *Priorities USA*, for example, the court permitted both chambers of the Michigan legislature to intervene in part because the injunction they challenged precluded the legislature from "enact[ing] any enforceable laws that even regulate hired voter transportation for federal elections." 978 F.3d

23

at 982. And absent intervention, the executive branch would have "nullif[ied] a state statute without any ultimate judicial determination." *Id.* at 980-81.

Likewise, in *Karcher v. May*, state legislative leaders had standing to intervene only because New Jersey law allowed them to represent the state. 484 U.S. 72, 81-82 (1987). As discussed, Arizona law does not confer that power on the State's Legislature.

## C. Any purported injury is extremely speculative.

On top of all the other defects in the Legislature's standing theory, it also fails because it is replete with alleged harms that are "far too speculative and conjectural" to establish standing. *Drake v. Obama*, 664 F.3d 774, 781 (9th Cir. 2011). The Legislature's theory is a triple bank shot—i.e., the creation of the federal Monument constrains State Trust Land in some way, which diminishes the value or utility of Trust Land, which impairs the Legislature's prerogative to legislate. And the allegations at each turn are squishy and equivocal. *See, e.g.,* Op. Br. at 35 (characterizing regulation of "federal land surrounding State Trust Land [as] a *de facto* exercise of regulatory authority over State Trust"); *id.* at 32 (claiming "obligation regarding State Trust Land … that is *affected* by the Proclamation") (emphasis added).

These allegations are not "concrete and particularized," as is required for standing. *Spokeo*, 578 U.S. at 339 (cleaned up). Rather, they rest on a "highly attenuated chain of possibilities" to establish harm. *Clapper*, 568 U.S. at 410. And because the status quo with respect to mining on the Monument land will not, in any event, change for at least seven years, the whole imagined causal chain involves injury that is neither "imminent" nor "substantially likely to occur." *Lake v. Fontes*, 83 F.4th 1199, 1204 (9th Cir. 2023); *Clapper*, 568 U.S. at 409 (to be "actual or imminent," a threatened injury must be "certainly impending"; "allegations of possible future injury are not sufficient" (cleaned up)).

## II. Plaintiffs' additional standing arguments are unavailing.

Plaintiffs do not have standing based on purported economic harm, resource diversion, or imagined threats to their water rights or future energy consumption.

### A. Alleged generalized economic loss does not confer standing.

The Legislature and the other Plaintiffs argue (at 19) that they "have standing because the Proclamation threatens their economic interests." Specifically, they claim that "the Legislature and the Treasurer" will "receive less revenue in the state budget and state funds," that the Local

Governments will lose tax revenue, and that Mohave County will bear costs "relating to its poverty services and measures to address budget shortfalls."

Each of these arguments is unavailing.

### 1. The Legislature and the Treasurer do not suffer economic injury when State revenue fluctuates.

Plaintiffs argue (at 19) that the Legislature and the Treasurer have suffered economic injury because they "will receive less revenue in the state budget and state funds from State Trust lands and mining."

This is patently wrong. State revenue belongs to the State, not to the Legislature or the Treasurer—as Plaintiffs themselves admit. *See* Ariz. Const. art. 9, Sec. 3 ("[a]ll taxes levied and collected for state purposes shall be paid into the state treasury"); Op. Br. at 19 (alleging "less revenue in the *state* budget and *state* funds") (emphasis added); *id.* at 3 ("changes in Trust income affect the State's budget generally"). The Treasurer and members of the Legislature are, by contrast, public servants who serve their respective functions irrespective of what revenue the State happens to take in during a given year. *See* Ariz. Const. art. 10, § 7 (Treasurer's role is to "deposit[]" monies from State lands); Ariz. Const. art. 4 § 1 (Legislature has legislative authority).

26

## 2. Alleged generalized tax loss does not confer standing.

To establish standing based on reduced tax revenue, a plaintiff must allege the "loss of specific tax revenues." *Wyoming*, 502 U.S. at 448. This means alleging the loss of quantified tax revenue in a manner that is supported by "[b]asic economic logic." *See New York v. Yellen*, 15 F.4th 569, 577 (2d Cir. 2021) (New York established standing by alleging and submitting declarations claiming federal tax-law change would decrease state real estate transfer tax revenue by specific dollar amounts).

In contrast, bare allegations regarding lost tax revenue arising from generalized economic harm do not establish standing. *See, e.g., Florida v. Mellon*, 273 U.S. 12, 17-18 (1927) (insufficient to allege that federal inheritance tax would "induc[e] potential taxpayers to withdraw property from the state, thereby diminishing the subjects upon which the state power of taxation may operate"); *Arias v. DynCorp*, 752 F.3d 1011, 1015 (D.C. Cir. 2014) (no standing based on plaintiffs' generalized allegation that defendants' conduct "cost them tax revenue," resulting in budget deficits).

The Local Governments have not come close to meeting their burden to establish standing based on purported tax loss. Rather, they assert (at 13) that they will lose "prosperity and tax revenue" due to the monument—a

prototypical example of a highly generalized allegation that cannot establish standing. *See, e.g., Miller v. Block*, 771 F.2d 347, 353 (8th Cir. 1985) (state lacked standing where it alleged that federal action would cause "agriculture production [to] suffer, which will dislocate agriculturally-based industries, forcing unemployment up and state tax revenues down").

Nor does Plaintiffs' own authority suggest a different result. In *City of Oakland v. Lynch*, Oakland alleged the loss of specific tax revenue resulting from the government's action to shut down a cannabis dispensary in the city. 798 F.3d 1159, 1163 (9th Cir. 2015) (dispensary "had paid city and state taxes in excess of one million dollars, and customers pay an 8.75% sales tax on all purchases") (cleaned up). Likewise, in *Yount v. Salazar*, the Plaintiffs also alleged a specific, quantified tax loss. No. CV11-8171-PCT DGC, 2013 WL 93372, at *12 (D. Ariz. Jan. 8, 2013) ("$9.5 million in mining claims payments and fees to local governments").

Similarly, in *Sierra Club v. Trump*—which was vacated by the Supreme Court—the States alleged "direct injuries in the form of lost tax revenues resulting from the cancellation of specific military construction projects." 977 F.3d 853, 870-71 (9th Cir. 2020) (recognizing that alleged injury to "a State's

28

economy" that "thereby cause[s] a decline in general tax revenues" is insufficient for standing).

While *City of Sausalito v. O'Neill* does not disclose the plaintiff's tax loss allegation in great detail, the plaintiff there specifically alleged that the challenged action would cause an increase of "2,700 daily visitors" to a small town, which would cause various injuries, including "congested streets, parks, parking lots, and sidewalks, increased crime, noise and trash, impaired and impeded use of streets for fire, police and other emergency services." 386 F.3d 1186, 1198-99 (9th Cir. 2004) (also alleging "injury to Sausalito's natural resources, citing an increase in 'noise and trash,' 'impaired air quality,' and harm to its 'marina, parks, trails and shoreline'").

The Local Governments have not alleged any tax-loss injury even approaching the level of specificity in any case where courts have found standing on that basis. Nor could they do so, given the attenuated and temporally remote nature of the purported injury.

### 3. Plaintiffs have not adequately alleged any other economic injury.

Plaintiffs—or at least Mohave County (at 19)—also repackage their generalized tax-loss argument as purported injury to their "budget[s]" and "poverty services." This is also unavailing.

Contrary to Plaintiffs' contention (at 19-20), *Yount* bears nothing beyond superficial resemblance to this case. In *Yount*, the federal government withdrew "more than one million acres of federal land in Northern Arizona from mining location and entry activities." 2013 WL 93372, at *1. Unlike the temporally remote implementation here, the notice of withdrawal immediately withdrew the land for environmental and other analysis for two years, followed by a final withdrawal for twenty years. *Id.* at *2. Because "[l]and withdrawals … are subject to valid existing rights," multiple plaintiffs challenged the action, including miners who "assert[ed] losses to their own mining interests as the primary basis for their injuries." *Id.* at *2-3; *id.* at *8 ("Yount alleges that he owns two hard rock uranium mining claims in the South Parcel of the withdrawal area.").

Thus, certain plaintiffs unquestionably had standing, irrespective of whether other parties did. And the Coalition that included Mohave County

alleged *specific* facts establishing the Coalition's standing—i.e., that Mohave County would lose "1,078 new jobs in the project area; $40 million annually from payroll; $29.4 billion in output; $2 billion in federal and state corporate income taxes; $168 million in state severance taxes; and $9.5 million in mining claims payments and fees to local governments." *Id.* at *12.

Plaintiffs now emphasize (at 21) that their excerpts of record include "Mohave County's declarations from the *Yount* litigation documenting" alleged revenue loss. But that is not how this works—parties cannot establish standing by pointing to previous harm that they alleged in a twelve-year-old case involving different parties and different facts. *See Nelsen v. King Cnty.*, 895 F.2d 1248, 1251 (9th Cir. 1990) ("past exposure to harm is largely irrelevant when analyzing claims of standing for injunctive relief that are predicated upon threats of future harm").

And Mohave County's ability to submit detailed declarations in the *Yount* case—while offering only generalized assertions here—only highlights the wide chasm between the two cases. Further, to the extent the other Plaintiffs are also trying to ride the coattails of Mohave County's old declarations, that is yet another problem for them. "Standing is not

dispensed in gross." *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (cleaned up).

Plaintiffs' related characterization (at 22) of the district court's ruling is also highly misleading. The court did not fault Plaintiffs "for failing to provide 'persuasive evidence'" in the sense that the court weighed their evidence; rather the court faulted them for submitting stale economic information from a case that was "more than a decade" old, while having nothing else to offer. 1-ER-24. Nor did the court say that they were *required* to submit affidavits; rather, it correctly observed that Mohave County had alleged only a generalized "loss of tax revenue … and reduced economic development," without any "new allegations"—i.e., anything newer than twelve years old—that would support standing. *Id.*

And contrary to Plaintiffs' further assertion (at 22), the district court did not "improperly limit[] their allegations to uranium mining" and thereby "fail to construe 'mining activities' in [their] favor." Plaintiffs' 235-paragraph complaint references uranium mining dozens of times, without mentioning the mining of any other natural resource a single time. Courts might "presume that general allegations embrace … specific facts," Op. Br. at 23 (cleaned up), but the district court here was not required to imagine

that Plaintiffs actually had some other secret, undisclosed variety of mining in mind. *See, e.g., Kedzierski v. Kedzierski*, 899 F.2d 681, 684 (7th Cir. 1990) (later argument cannot "substitute for missing allegations in the complaint").

And no Plaintiff has any direct interest in the mining of any natural resource—uranium or otherwise—from the Monument, in any event. Thus, Plaintiffs' spin on their allegations invariably collapses (at 23) back into the claim of generalized "harm through lost tax revenue and lost economic productivity"—which, again, comes nowhere close to establishing standing. *See Mellon*, 273 U.S. at 17-18.

### 4. Temporal remoteness renders Plaintiffs' claim even more speculative.

As Plaintiffs admit (at 6), mining on the Monument is already banned until 2032, irrespective of this case's outcome, rendering any purported harm temporally remote. *See McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 226 (2003), *overruled in part on other grounds*, *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010) (holding that alleged injury five years in the future was "too remote temporally to satisfy Article III standing").

Plaintiffs nonetheless assert (at 23-24) that the district court "misinterpret[ed] … an overturned Supreme Court decision"—i.e.,

33

*McConnell*—in finding that alleged harm after a multi-year time gap was not "'imminent' or 'certainly impending.'" On the contrary, as the district court correctly observed, 1-ER-22, *McConnell* was not overturned by *Citizens United*; rather, it was overruled in part, on grounds unrelated to standing. *See Citizens United*, 558 U.S. at 365.

Citing *Thomas More Law Ctr. v. Obama*, 651 F.3d 529 (6th Cir. 2011), Plaintiffs also assert (at 24) that "[s]tanding failed in *McConnell* because of the uncertainty of harm, not its temporal distance." This is an odd claim, given that the Sixth Circuit obviously cannot rewrite the Supreme Court's plain holding—and also given that *Thomas More* cites *McConnell's* temporal holding. 651 F.3d at 538. The court in *Thomas More* simply gave less weight to timing because the alleged harm in that case—that the plaintiffs would be compelled to purchase and maintain health insurance under the Affordable Care Act—would be virtually certain when the Act went into effect. *Id.* at 538-339.

As *Thomas More* states, "[i]mminence is a function of probability." *Id.* at 536. And contrary to Plaintiffs' misleading suggestion, the district court here did not focus on temporal distance in isolation. Rather, it recognized that any theoretical harm in 2032 would "likely [be] dependent on uranium

34

prices, as well as the future interest of mining companies in pursuing uranium mine development in the area," not to mention other possible intervening events that could materially change the situation. 1-ER-23. Nor is there any need to parse the district court's analysis when—again— Plaintiffs pled only highly generalized injury while citing twelve-year-old data pertaining to a single Plaintiff in a different case. If the alleged harm is too distant and improbable for Plaintiffs themselves to tell a court what it is, no court is going to rewrite their complaint to confer standing.

Plaintiffs' reliance on cases like *Blanchette v. Connecticut General Insurance Corps.*, "[w]here the inevitability of the operation of a statute against certain individuals [was] patent," 419 U.S. 102, 143 (1974), is therefore also misplaced. And *Orangeburg, S.C. v. FERC* was "an unusual case where [defendant's] exceptional delay … necessitated resolving … legal issues as the first step of facilitating the forthcoming contracting process" between the plaintiff city and a power company. 862 F.3d 1071, 1079 (D.C. Cir. 2017).

Plaintiffs (at 26) mischaracterize other cases. In *Belmont Abbey College v. Sebelius*, for example, implementation of the Affordable Care Act rule at issue was only a couple years in the future. 878 F.Supp.2d 25, 36 (D.D.C.

35

2012). But the court nonetheless held that "the injuries alleged by Plaintiff [were] not certainly impending" in light of a likely "amendment to the final rule" that could "vitiate the threatened injury." *Id.* at 37 (cleaned up). The court also found that the case was unripe because "its uncertain nature ... might affect [the] court's ability to decide intelligently." *Id.* at 40 (cleaned up).

### 5. Plaintiffs cannot invent new allegations about immediate harm.

Plaintiffs also now argue (at 25) that they have suffered immediate harm because the 2012 Withdrawal did not limit "mineral or geothermal" leasing, while the Monument does. But as the district court correctly found, the "Complaint contains no allegations of harm suffered as a result of the Proclamation's impact on mineral or geothermal leasing." 1-ER-25. Once again, Plaintiffs are simply flailing in search of a standing theory without regard for whether it is encompassed within their actual allegations.

And in any event, purported harm arising from a change in the leasing policy on federal land is still far too speculative and attenuated to support standing.

### 6. Plaintiffs' claims are not redressable.

Contrary to Plaintiffs' further assertion (at 28), the district court's recognition that there is "uncertainty" about whether a future Secretary will extend the 2012 withdrawal does not render the court's finding on lack of redressability "speculative."

"There is a close relation between the requirement of power to redress a claimed injury and the requirement of a causal link between the injury asserted and the relief claimed." *Gonzales v. Gorsuch*, 688 F.2d 1263, 1267 (9th Cir. 1982). Thus, as a starting point here, Plaintiffs' purported injuries cannot be redressed for the same reason that they otherwise do not support standing—they are far too attenuated and speculative.

Further, as the district court recognized, 1-ER-26, justiciability requires that there be at least "a significant likelihood of … redress." *Id*. The probability of an extension of the 2012 Withdrawal undoubtedly hinges on numerous future events (including political developments), many of which are not at all foreseeable—let alone predictable—seven years in advance. Thus, even if redressability hinged solely on the withdrawal's extension (ignoring the other causal problems), there is no way to find "a significant likelihood" of redress.

**B.    Appellants cannot establish harm based on diversion of resources.**

Plaintiffs' resource-diversion theory fails under *Hippocratic Medicine*. Nor would it have come close to establishing standing under pre-*Hippocratic Medicine* standards.

### 1.    Diversion of resources alone is insufficient to establish standing.

For many years under this Circuit's authority, an organizational plaintiff could establish standing by showing "diversion of its resources" and "frustration of its organizational mission." *See, e.g., Am. Diabetes Ass'n v. United States Dep't of the Army*, 938 F.3d 1147, 1154 (9th Cir. 2019).

Last year, however, the Supreme Court established a more stringent test, under which a plaintiff must show that the defendant's actions "directly affect[] and interfere[] with [Plaintiff's] core business activities." *Hippocratic Medicine*, 602 U.S. at 395. The Court rejected the notion that "standing exists when an organization" only "diverts its resources in response to a defendant's actions." *Id.* Otherwise, "all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies," which would be "an expansive theory of standing" unsupported by precedent. *Id.*

38

Thus, while organizations can still establish organizational standing, they cannot do so by simply "using resources to counter the government action." *Tennessee Conference of NAACP v. Lee*, 139 F.4th 557, 565 (6th Cir. June 5, 2025). A standalone diversion-of-resources theory that may have established standing in the past is therefore no longer sufficient to establish organizational standing today. *Id.* at 563 (stating that *Hippocratic Medicine* "disavowed [the Sixth Circuit's] diversion-of-resources theory").

> ### 2. Plaintiffs' claim could not survive the most forgiving standards, let alone *Hippocratic Medicine's* requirements.

As a threshold matter, the district court stated that it was "unaware of any case in this circuit in which a diversion of resources theory of standing has been considered or accepted for a governmental plaintiff." 1-ER-17. Now, with every opportunity to point this Court to such a case, Plaintiffs have still failed to do so.

Beyond that, as the district court also observed, another fundamental problem with Plaintiffs' resource-diversion theory is that their purported injuries are "indistinguishable from the due performance of their respective functions." 1-ER-18. This has not changed on appeal, as their lead example of resource diversion shows. Plaintiffs explain (at 40) that the Proclamation

39

provides for the federal government to "seek to collaborate with the State of Arizona on wildlife management within the monument," which they say "necessarily requires the Legislature and the Treasurer to divert resources from other vital public tasks." And this in turn (*id.*), "may require new legislation" that will "divert staff time." Likewise, they complain (at 40-41) that the Treasurer may need to "invest[] and divest[]" money in State wildlife funds.[2]

Under longstanding authority, an activity is not an injury and so cannot establish standing if it is no more than mere "business as usual." *Am. Diabetes Ass'n*, 938 F.3d at 1155. It is hard to imagine more quintessential examples of "business as usual" than a legislature legislating or a treasurer managing money.

---

[2] Other resource-diversion allegations that Plaintiffs have declined to highlight are of a similar vein. *See, e.g.*, 2-ER-303 ¶ 191(f) (alleging that "the Legislature will have to divert resources to protect [its] interest by monitoring the effect the Proclamation will have on State Trust Lands," including by "devoting resources to publicly commenting on the management plan, seeking information about Monument management from state or federal entities, and passing laws and regulations to address the new legal framework governing the Ancestral Footprints Monument").

Further, the road to Plaintiffs' nonexistent injury is again paved with layers of specious assumption and speculation. The Proclamation does not require the Legislature or Treasurer—or for that matter, the State—to do anything. Rather, as the Legislature admits (at 40), it merely "provides that the Federal Government 'shall seek to collaborate with the State.'" This innocuous provision in turn leads to the imagined scenarios that "the Proclamation *may* require new legislation" and that "[s]everal state funding streams would *potentially* finance the collaboration." Op. Br. at 40 (emphasis added).

Plaintiffs, moreover, barely even argue that the Monument has interfered with their core business activities, as is required by *Hippocratic Medicine*. 602 U.S. at 395. Rather, they assert (at 42) that it "affects [their] core activities"—and then they proceed to repeat their diversion arguments in slightly different language. *See, e.g., id.* (arguing that the Legislature may need "to pass new laws" and that "the diversion of Treasurer Yee's resources implicates statutory directives to the Treasurer").

Plaintiffs also say (at 42) that "[i]t is no different for the Local Governments"—which is true, insofar as the Local Governments' theory is also based on business-as-usual activities, and is also amorphous and

41

speculative. *See id.* (complaining that the Local Governments will need to "engag[e] with the United States about management of the Ancestral Footprints Monument"). Left without anything else to say, Plaintiffs then repeat their economic loss arguments, which fail for the reasons discussed earlier. *See* Argument § II(A).

### 3. Plaintiffs' criticism of the district court's opinion is meritless.

Contrary to Plaintiffs' further suggestion (at 38), the district court did not "err[] by relying on the panel decision in *Arizona Alliance for Retired Americans v. Mayes*, 117 F.4th 1165 (9th Cir. 2024)." As a factual matter, this Court had not accepted *Arizona Alliance* for en banc review at the time the district court relied on it, so there was no error in relying on a controlling Ninth Circuit decision.

Nor is *Arizona Alliance* the key authority for the disposition here. *Arizona Alliance* relies heavily on *Hippocratic Medicine*, and *Hippocratic Medicine* is binding precedent irrespective of the outcome of this Court's en banc review. And regardless—as the State and Governor emphasized in their briefing below (and argue now)—Plaintiffs' resource-diversion theory

fails under longstanding Ninth Circuit authority. *Hippocratic Medicine* and *Arizona Alliance* merely "set[] the bar even higher." *See* SER-011–012.

## C. Plaintiffs' purported concern about water rights does not confer standing.

As Plaintiffs concede, the Proclamation expressly provides that it does not "affect 'valid existing water rights of any part[y].'" 2-ER-301 ¶ 189 (citing 88 Fed. Reg. at 55,339). The premise that the Monument will have *any* impact on Plaintiffs' water rights—let alone an injurious impact—is therefore wholly based on the notion that "the Proclamation creates an implied federally reserved water right to unappropriated water 'necessary to serve the purposes of [the] federal reservation.'" Op. Br. at 44 (quoting *John v. United States*, 720 F.3d 1214 (9th Cir. 2013) (emphasis added).

As the district court found, Plaintiffs have not even "attempt[ed] to quantify the amount of water that will be necessary to serve the Monument's purposes," rendering any "supposed potential effects" on their own water rights "mere conjecture." 1-ER-18–19.

Plaintiffs' characterization of their water-related claim on appeal also bears little resemblance to the claim that they actually pled. Below, they alleged that there was "*ambiguity* about water rights in the region." 2-ER-301

43

¶ 189 (emphasis added); *id.* at 308 ¶ 194(b) ("[t]he Monument *raises concerns* about Colorado City's water supply and will require Colorado City to *begin investigating* other water supply options in the event that decisions by the Defendants or other federal government actors reduce Colorado City's water supply").

Plaintiffs are now going lighter on the facially speculative language, but they "are necessarily bound by the allegations and claims in their complaint." *Fisk v. Inslee*, 759 F. App'x 632, 634 (9th Cir. 2019). And regardless, their standing theory in substance still consists only of bare assertions untethered from any plausible theory of harm.

Plaintiffs acknowledge that they "have a right to '[w]ithdraw and use groundwater for reasonable and beneficial use.'" A.R.S. § 45-453(1). And there is no dispute that the Monument, by its express terms, is not meant to impact "valid existing water rights." 2-ER-301 ¶ 189. But Plaintiffs nonetheless assert (at 47) that a "conflict is likely to occur soon [that] will result in a restriction in the water the Local Governments can pump."

How, exactly, is this "conflict" going to occur? Will there be massive groundwater pumping from the largely uninhabited Monument area that will impact Plaintiffs' access to water? Will a court in an unknown future

44

case find, for some unknown reason, that Plaintiffs' groundwater pumping should be restricted? Plaintiffs do not say, and both theories are too farfetched to merit serious discussion. *See, e.g., Clapper*, 568 U.S. at 410 ("mere speculation" based "on a highly attenuated chain of possibilities[] does not satisfy the requirement that threatened injury must be certainly impending"); *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) ("[a]llegations of possible future injury" are insufficient).

Plaintiffs also argue for the first time that the Proclamation's express protection of "valid existing rights" is irrelevant "because there is no right of ownership of groundwater in Arizona prior to its capture." Op. Br. at 48 (cleaned up). This additional level of abstraction does them no favors. If there "is no right of ownership," then Plaintiffs have supplied an additional basis to find that they lack standing. On the other hand, if—as is apparently the case—they are complaining about an imagined "restriction" on their right to extract groundwater, then rights while the water is still in the ground are irrelevant.

### D. Plaintiffs do not have standing as energy consumers.

Plaintiffs previously framed their energy theory of standing in terms of their fear of Russian aggression. *See* SER-014–015 ("[t]he conduct of

foreign adversaries, like Russia, is part of the background environment impacting the energy supply" and "domestic uranium production in Arizona would mitigate the risks associated with that conduct"). While they still nod towards Russia (at 27), their standing theory (at 48) has morphed into the more generalized assertion "that the Proclamation will disrupt the energy supply and impose higher prices on them."

There are still almost too many speculative layers to count. The starting point, again, is that the 2012 Withdrawal will remain in effect through at least 2032. There is no allegation or logical explanation of how maintaining the status quo after 2032 will "disrupt" the State's energy supply. Nor do Plaintiffs allege or explain how an ongoing mining restriction on one Monument will impose higher prices on them; they do, however, note (at 48) that "President Trump recently sign[ed] executive orders to increase domestic uranium production"—highlighting one of innumerable factors that may bear on future energy prices.

Plaintiffs, moreover, do not even try to address how rising energy prices would impact them in a manner distinct from every other human and entity that consumes energy. Such generalized grievances do not meet the particularized injury requirement in Article III. *Lance v. Coffman*, 549 U.S. 437,

46

442 (2007) (refusing to find standing for an "undifferentiated, generalized grievance about the conduct of government").

Plaintiffs' energy theory is, in short, lacking even colorable plausibility—and as in the district court, they "expend little of their … brief in defense of it." 1-ER-26-27.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's dismissal of this case.

Respectfully submitted this 3rd day of September, 2025.

KRISTIN K. MAYES
  ARIZONA ATTORNEY GENERAL

By */s/Alexander Samuels*
Alexander Samuels
Clinten Garrett
Joshua A. Katz
OFFICE OF THE ARIZONA
ATTORNEY GENERAL
2005 N. Central Ave.
Phoenix, AZ 85004
(602) 542-3333
Alexander.Samuels@azag.gov
Clinten.Garrett@azag.gov
Joshua.Katz@azag.gov
ACL@azag.gov

*Counsel for State of Arizona*

By <u>/s/Emily Brailey (with permission)</u>
Sean Berens (034302)
Emily Brailey (039273)
OFFICE OF ARIZONA GOVERNOR
KATIE HOBBS
1700 West Washington St., 9th Fl.
Phoenix, AZ 85004
(602) 542-6578
Sberens@az.gov
Ebrailey@az.gov

*Attorneys for Arizona Governor Katie Hobbs*

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Circuit Rule 32-1(a) because it contains 9,052 words according to the word-processing system used to prepare the brief.

2.  This brief complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in fourteen-point Book Antiqua type style.

Dated this 3rd day of September, 2025.

By */s/Alexander Samuels*

## CERTIFICATE OF SERVICE

I certify that I presented the above and foregoing for filing and uploading to the CM/ECF system which will send electronic notification of such filing to all counsel of record.

Dated this 3rd day of September, 2025.

*/s/Alexander Samuels*